1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT SEATTLE

ROBERT KENNY,

                                        Plaintiff,

        v.

PACIFIC INVESTMENT MANAGEMENT
COMPANY LLC, a Delaware limited liability
company; PIMCO INVESTMENTS LLC,

                                        Defendants.

No. 15-cv-2037

**ANNIVERSARY COMPLAINT**

**JURY DEMAND**

COMPLAINT
(CASE NO. 15-2037)

**RICHARDSON, PATRICK, WESTBROOK &
BRICKMAN, LLC**
174 East Bay Street, P.O. Box 879
Charleston, SC 29401
TELEPHONE: (843) 727-6520
FACSIMILE: (843) 727-3103

**KELLER ROHRBACK L.L.P.**
1201 Third Avenue, Suite 3200
Seattle, Washington 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

## TABLE OF CONTENTS

I.    JURISDICTION AND VENUE ................................................................. 2

II.   PARTIES ................................................................................................ 3

      A.    Plaintiff ....................................................................................... 3

      B.    The Fund ..................................................................................... 3

III.  GENERAL BACKGROUND ................................................................. 5

      A.    The Investment Company Act of 1940 ........................................ 5

      B.    Inherent Conflict in the Structure of Mutual Funds .................... 7

      C.    Mutual Fund Fees ........................................................................ 9

      D.    Rule 12b-1 Distribution Plans ................................................... 10

IV.   PIMCO BACKGROUND ..................................................................... 12

      A.    PIMCO Fund Complex ............................................................. 12

      B.    Turmoil at PIMCO and the Fund .............................................. 13

V.    SUBSTANTIVE ALLEGATIONS ....................................................... 17

      A.    Size of Fees Paid by the Fund to PIMCO .................................. 19

            1.    Investment Advisory, Supervisory and Administrative Fees ................. 21

            2.    Distribution Fee and Servicing Fee (12b-1 Fees) .................................. 24

      B.    Economies of Scale .................................................................... 27

            1.    PIMCO's Economies of Scale in Investment Advisory
                  Services ......................................................................... 31

            2.    Defendants' Economies of Scale in Supervisory and
                  Administration Services ................................................ 34

            3.    Defendants' Economies of Scale in Distribution and
                  Servicing Fees .............................................................. 36

      C.    Comparative Fee Structure ......................................................... 37

            1.    Rates charged by PIMCO to Private Clients ............................ 37

COMPLAINT
(CASE NO. 15-2037)

**RICHARDSON, PATRICK, WESTBROOK &**
**BRICKMAN, LLC**
174 East Bay Street, P.O. Box 879
Charleston, SC 29401
TELEPHONE: (843) 727-6520
FACSIMILE: (843) 727-3103

**KELLER ROHRBACK L.L.P.**
1201 Third Avenue, Suite 3200
Seattle, Washington 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

2.  Rates charged by PIMCO for sub-advising the Harbor Bond Fund .................................................................. 40

3.  Rates charged by PIMCO to the Total Return Active Exchange-Traded Fund .......................................... 42

D.  The Nature And Quality Of The Services Provided To The Fund's Shareholders ............................................. 43

E.  The Profitability Of The Fund ............................................ 47

F.  Fallout Benefits (Indirect Profits) To Defendants Attributable To The Fund ................................................................. 50

G.  The Independence And Conscientiousness Of The Trustees ........................... 51

1.  Role of Independent Trustees Under Legal and Regulatory Framework ................................................. 51

2.  The Compensation Structure for the PIMCO Board Leads to Lack of Independence .................................. 52

3.  The Composition of the PIMCO Board Leads to Lack of Independence and Conscientiousness ............................ 55

4.  The Information Defendants Provide to the PIMCO Board is Inadequate ................................................. 58

VI.    CLAIM I ............................................................................. 60

VII.   CLAIM II ............................................................................ 61

VIII.  PRAYER FOR RELIEF ........................................................ 63

RICHARDSON, PATRICK, WESTBROOK
& BRICKMAN, LLC
174 East Bay Street, P.O. Box 879
Charleston, SC 29401
TELEPHONE: (843) 727-6520
FACSIMILE: (843) 727-3103

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, Washington 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

1      Plaintiff files this nearly identical Anniversary Complaint on the one year anniversary of

2   the filing of his original Complaint, *Kenny v. Pacific Investment Management Company LLC, et*

3   *al.*, Civ. No. C14-1987, W.D. Wash. (J. Martinez). Plaintiff believes that his original Complaint

4   is sufficient to allege a continuing violation of the Investment Company Act, *see Gallus v.*

5   *Ameriprise Fin., Inc.*, 561 F.3d 816, 825 (8th Cir. 2009), ("the damage limitation yields only a

6   retrospective limitation . . . [so] where the plaintiffs have continued to suffer damage during the

7   litigation, both the language of the statute and the interests of judicial economy suggest that

8   redress should be available in a single action." However, the *Gallus* decision was vacated on

9   other grounds, 130 S. Ct. 2340 (2010), and Defendants have asserted as their Third Affirmative

10  Defense in the original action that "Plaintiff's claims are barred in whole or in part by the

11  applicable statute of limitations and the one-year "look-back" statutory limitation on damages

12  included in Section 36(b) of the ICA." Accordingly, Plaintiff files this Anniversary Complaint in

13  order to leave no doubt that he has asserted damages for the one year that followed the filing of

14  his original complaint. For the Court's convenience, new, modified, and/or updated information

15  from the Complaint is underlined in this Anniversary Complaint.

16      Plaintiff, Robert Kenny, for the use and benefit of the PIMCO Total Return Fund, sues

17  Defendants Pacific Investment Management Company LLC ("PIMCO") and PIMCO

18  Investments LLC, and alleges:

19      1.      Plaintiff is a shareholder of the PIMCO Total Return Fund (the "Total Return

20  Fund" or the "Fund"), the mutual fund that until recently had the largest amount of assets under

21  management in the world. Plaintiff brings claims against the Fund's investment advisor

22  (PIMCO) and subsidiary distributor (PIMCO Investments LLC) under Section 36(b) of the

23  Investment Company Act of 1940 ("ICA") (15 U.S.C. § 80a-35(b)), which imposes a fiduciary

24

COMPLAINT
(CASE NO. 15-2037)
1

**RICHARDSON, PATRICK, WESTBROOK
& BRICKMAN, LLC**
174 East Bay Street, P.O. Box 879
Charleston, SC 29401
TELEPHONE: (843) 727-6520
FACSIMILE: (843) 727-3103

**KELLER ROHRBACK L.L.P.**
1201 Third Avenue, Suite 3200
Seattle, Washington 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

duty on the Defendants to ensure that the compensation they receive is not excessive. Here, Defendants PIMCO and PIMCO Investments LLC have breached that duty by receiving excessive compensation from the Fund, Plaintiff, and the other Fund shareholders that is so disproportionately large that it bears no reasonable relationship to the services rendered and could not have been the product of arm's-length negotiations.

2.      With this Complaint, Plaintiff seeks to: 1) rescind the investment advisory agreements, the supervisory and administration agreements ("administrative" agreements), and the distribution and servicing agreements the Fund has entered into with Defendants; and 2) recover the amounts charged by Defendants or, alternatively, recover any improper compensation retained by Defendants in breach of their fiduciary duty under Section 36(b) of the ICA, as amended. Because the conduct complained of herein is continuing in nature, Plaintiff seeks recovery for a period commencing at the earliest date in light of any applicable statute of limitations through the date of final judgment after trial.

## I.      JURISDICTION AND VENUE

3.      This action is a derivative action brought by Plaintiff on behalf of the PIMCO Total Return Fund pursuant to § 36(b) of the ICA, as amended and codified at 15 U.S.C. § 80a-35(b).

4.      This Court has subject matter jurisdiction pursuant to 15 U.S.C. § 80a-43, 15 U.S.C. § 80a-35(b)(5), and 28 U.S.C. § 1331.

5.      Personal jurisdiction and venue are proper in this judicial district pursuant to 15 U.S.C. § 80a-43 and 28 U.S.C. § 1391(b). Defendants transact business in this District, a substantial part of the events or omissions that give rise to Plaintiff's claims occurred in this District, and/or Defendants may be found in this District.

COMPLAINT
(CASE NO. 15-2037)
2

**RICHARDSON, PATRICK, WESTBROOK & BRICKMAN, LLC**
174 East Bay Street, P.O. Box 879
Charleston, SC 29401
TELEPHONE: (843) 727-6520
FACSIMILE: (843) 727-3103

**KELLER ROHRBACK L.L.P.**
1201 Third Avenue, Suite 3200
Seattle, Washington 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

6.      No pre-suit demand on the Board of Trustees that oversees the PIMCO Total Return Fund is required, as the requirements of Federal Rule 23.1 do not apply to actions brought under § 36(b) of the ICA. *Daily Income Fund, Inc. v. Fox*, 464 U.S. 523, 542 (1984).

7.      All conditions precedent have been performed or have occurred.

## II.      PARTIES

### A.      Plaintiff

8.      Plaintiff Robert Kenny is a resident of Clinton, Washington, and is a shareholder of the PIMCO Total Return Fund. In 2011, Plaintiff contacted PIMCO from his home in Clinton to begin investing in the Fund. Plaintiff undertook and completed all the transactions necessary to invest in the Fund through repeated contacts with PIMCO representatives via the telephone, email, U.S. Mail, and PIMCO's websites. All of these contacts and transactions occurred in Clinton, Washington, at Plaintiff's home. Plaintiff has continued to contact PIMCO representatives from his home—and Defendants' representatives have continued to contact Plaintiff at his home—regarding his accounts via telephone, email, U.S. Mail, telefax, and through PIMCO's websites.

### B.      The Fund

9.      The PIMCO Total Return Fund is a mutual fund held in the PIMCO Trust, an open-end management investment company registered under the ICA. The Fund is the largest of the 88[1] PIMCO mutual funds held in the Trust, for which Defendants provide investment advisory, administrative, and distribution services. At the close of the fiscal year 2014 (*i.e.* March 31, 2015), the PIMCO Total Return Fund held over $116 *billion* in assets under management. The Fund "seeks maximum total return, consistent with preservation of capital and

---

[1] As of December 7, 2015. *See* PIMCO Funds, Statement of Additional Information, at 1 (July 31, 2015, as supplemented December 7, 2015) ("2014 SAI").

**RICHARDSON, PATRICK, WESTBROOK & BRICKMAN, LLC**
174 East Bay Street, P.O. Box 879
Charleston, SC 29401
TELEPHONE: (843) 727-6520
FACSIMILE: (843) 727-3103

**KELLER ROHRBACK L.L.P.**
1201 Third Avenue, Suite 3200
Seattle, Washington 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

prudent investment management," by "investing under normal circumstances at least 65% of its total assets in a diversified portfolio of Fixed Income Instruments of varying maturities. . . ." PIMCO Funds, Prospectus, at <u>27 (July 31, 2015)</u>.

10.      <u>Until late 2013,</u> the Fund was the largest mutual fund in the world.

11.      Defendant Pacific Investment Management Company LLC is a Delaware limited liability company headquartered in Newport Beach, California, that actively maintains a presence in various locations throughout the United States. PIMCO is a registered investment advisor under the Investment Advisers Act of 1940. PIMCO received compensation from the Fund and all funds in the Fund Complex for investment advisory and administrative services it provides to the Fund and the other funds in the Fund Complex.[2] Defendant PIMCO regularly transacts business in Washington, including, but not exclusively, through the network of broker-dealers and financial firms with whom it does business.

12.      Defendant PIMCO Investments LLC is headquartered in New York, New York. Defendant PIMCO Investments LLC is a registered broker-dealer under the Securities and Exchange Act of 1934 and a member of FINRA. PIMCO Investments LLC is registered to operate in Washington State. On information and belief, it also maintains offices in Newport Beach, California. PIMCO Investments LLC is a wholly-owned subsidiary of PIMCO and an indirect subsidiary of Allianz SE. Defendant PIMCO Investments LLC received compensation from the Fund and the other funds in the Fund Complex as the distributor and principal underwriter of the Fund and the other funds in the Fund Complex. Defendant PIMCO

---

[2] PIMCO is a majority owned subsidiary of Allianz Asset Management, with minority interests held by certain of its current and former officers, by Allianz Asset Management of America LLC, and by PIMCO Partners, LLC, a California limited liability company. Prior to December 31, 2011, Allianz Asset Management was named Allianz Global Investors of America L.P. PIMCO Partners, LLC is owned by certain current and former officers of PIMCO. Through various holding company structures, Allianz Asset Management is majority owned by Allianz SE.

RICHARDSON, PATRICK, WESTBROOK
& BRICKMAN, LLC
174 East Bay Street, P.O. Box 879
Charleston, SC 29401
TELEPHONE: (843) 727-6520
FACSIMILE: (843) 727-3103

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, Washington 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

Investments LLC regularly transacts business in Washington, including, but not exclusively, through the network of broker-dealers and financial firms with whom it does business.

## III.   GENERAL BACKGROUND

### A.   The Investment Company Act of 1940

13.     Congress recognized as early as 1935 that mutual funds "present[ed] special features which require[d] attention beyond simply the disclosure philosophy of the Securities Act of 1933," *see* H.R. Rep. No. 91-1382, at 2 (1970), because "a typical [mutual] fund is organized by its investment advisor which provides it with almost all management services and because its shares are bought by investors who rely on that service, a mutual fund cannot, as a practical matter sever its relationship with the advisor," S. Rep. No. 91-184, at 5 (1969). Therefore, "the forces of arm's-length bargaining do not work in the mutual fund industry in the same manner as they do in other sectors of the American economy." S. Rep. No. 91-184, at 5 (1969); *see also Jones v. Harris Assocs. L.P.*, 559 U.S. 335, 338 (2010). Rather, "the relationship between investment advisers and mutual funds is fraught with potential conflicts of interest," *Burks v. Lasker*, 441 U.S. 471, 481 (1979), and "potentially incestuous," *Gartenberg v. Merrill Lynch Asset Mgmt., Inc.*, 694 F.2d 923, 929 (2d Cir. 1982).

14.     Accordingly, in 1940, Congress enacted the Investment Company Act recognizing that:

> [T]he national public interest and the interest of investors are adversely affected…when investment companies are organized, operated [and] managed…in the interest of…investment advisers…rather than in the interest of [shareholders]…or when the investment companies…are not subjected to adequate independent scrutiny.

ICA § 1(b)(2), 15 U.S.C. § 80a-1(b). The ICA was designed to regulate and curb abuses in the mutual fund industry and to create standards of care applicable to investment advisors such as Defendant PIMCO.

RICHARDSON, PATRICK, WESTBROOK
& BRICKMAN, LLC
174 East Bay Street, P.O. Box 879
Charleston, SC 29401
TELEPHONE: (843) 727-6520
FACSIMILE: (843) 727-3103

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, Washington 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

15. In the 1960s, it became clear to Congress that investment advisers to mutual funds were gouging the funds with excessive fees. A report produced by the Wharton School that the SEC commissioned found that investment advisers tended to charge mutual funds "substantially higher" rates than they charged other clients. *A Study of Mutual Funds Prepared for the Securities and Exchange Commission by the Wharton School of Finance and Commerce*, H.R. Rep. No. 2274, at 29 (1962). Thereafter, the SEC concluded in a study it conducted that board and shareholder approval could not protect shareholder interests with respect to advisory compensation because as a practical matter mutual funds could not terminate their relationships with their advisers. *Report of the Securities and Exchange Commission on the Public Policy Implications of Investment Company Growth*, H.R. Rep. No. 2337, at 148 (1966).

16. As a result, Section 36(b) was added to the ICA in 1970 primarily to afford oppressed fund shareholders with a remedy to recover the excessive fees charged by mutual funds such as that owned by Plaintiff, creating a federal cause of action for breach of fiduciary duty by investment advisers. The statute provides for quasi-derivative claims (with no demand requirement).

17. Section 36(b) provides in pertinent part:

> [T]he investment adviser of a registered investment company shall be deemed to have a fiduciary duty with respect to the receipt of compensation for services, or of payments of a material nature, paid by such registered investment company, or by the security holders thereof, to such investment adviser or any affiliated person of such investment adviser.

ICA § 36(b), 15 U.S.C. § 80a-35(b).

18. Further, in enacting Section 36(b), "Congress decided not to rely solely on the fund's directors to assure reasonable adviser fees," *Daily Income Fund*, 464 U.S. at 540, and also added a provision to Section 36(b) that provides:

> In any such action approval by the board of directors of such investment company of such compensation or payments, or of contracts or other arrangements providing for such compensation or payments, and ratification or approval of such compensation or payments, or of contracts or other arrangements providing for such compensation or payments, by the shareholders of such investment company, shall be given such consideration by the court as is deemed appropriate *under all the circumstances*.

15 U.S.C. § 80a-35(b)(2) (emphasis added). Through Section 36(b), Congress gave shareholders a "unique right," *Daily Income Fund*, 464 U.S. at 536, empowering them with the ability to be an independent check on unfair fees.

**B.     Inherent Conflict in the Structure of Mutual Funds**

19.     Mutual funds themselves are basically corporate shells that have few or no employees. Instead, the mutual fund contracts for all of the services it needs, including distribution of its securities, custodianship of its assets, auditing, servicing shareholder accounts, portfolio management, and day-to-day operation, all of which are provided by or arranged for by the investment advisor and their affiliates.

20.     When a new mutual fund is started, the fund's advisor contracts to provide all the services the fund needs and also nominates and elects the fund's board of directors or board of trustees.

21.     While mutual fund boards are supposed to be the "watchdogs" for the shareholders of the funds, two noteworthy industry insiders have commented on the general failure of mutual fund boards to fulfill their responsibilities under the ICA. Jack Bogle, founder of The Vanguard Group, Inc. ("Vanguard") made the following comment:

> Well, fund directors are, or at least to a very major extent, sort of a bad joke. They've watched industry fees go up year after year, they've added 12b-1 fees. I think they've forgotten, maybe they've never been told, that the law, the Investment Company Act, says they're required to put the interest of the fund shareholders ahead of the interest of the fund adviser. It's simply impossible for me to see how they could have ever measured up to that mandate, or are measuring up to it.

COMPLAINT
(CASE NO. 15-2037)
7

**RICHARDSON, PATRICK, WESTBROOK & BRICKMAN, LLC**
174 East Bay Street, P.O. Box 879
Charleston, SC 29401
TELEPHONE: (843) 727-6520
FACSIMILE: (843) 727-3103

**KELLER ROHRBACK L.L.P.**
1201 Third Avenue, Suite 3200
Seattle, Washington 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

22.    Warren Buffet, famous investor and chairman of Berkshire Hathaway, observed

in his letter to shareholders in the 2002 Berkshire Hathaway, Inc. annual report:

> [A] monkey will type out a Shakespeare play before an "independent" mutual-
> fund director will suggest that his fund look at other managers, even if the
> incumbent manager has persistently delivered substandard performance. . . .
> Investment company directors have failed as well in negotiating management
> fees. . . . If you or I were empowered, I can assure you that we could easily
> negotiate materially lower management fees with the incumbent managers of
> most mutual funds. And, believe me, if directors were promised a portion of any
> fee savings they realized, the skies would be filled with falling fees. Under the
> current system, though, reductions mean nothing to "independent" directors while
> meaning everything to managers.

Berkshire Hathaway, Inc., 2002 Annual Report to Shareholders 17-18 (2003), available at

http://www.berkshirehathaway.com/2002ar/2002ar.pdf.

23.    The watchfulness and effectiveness of boards of trustees continues to be an issue

today. Indeed, as Judge Posner observed in his dissent from the denial of a petition for rehearing

en banc in *Jones v. Harris* there are "growing indications that executive compensation in large

publicly traded firms often is excessive because of the feeble incentives of boards of directors to

police compensation." *Jones v. Harris Assocs. L.P.*, 537 F.3d 728, 730 (7th Cir. 2008), *vacated

and remanded*, 559 U.S. 335 (2010). Indeed, "'broad cross-sectional analysis reveals little

consistent evidence that board composition is related to lower fees and higher returns for fund

shareholders.'" *Id.* at 731 (quoting "OEA Memorandum: Literature Review on Independent

Mutual Fund Chairs and Directors," Dec. 29, 2006).

24.    And, as the Supreme Court held in *Jones*, "where the board's process was

deficient or the adviser withheld important information, the court must take a more rigorous look

at the outcome" in judging whether a fee received by an investment advisor is excessive. *Jones*,

559 U.S. at 351.

COMPLAINT
(CASE NO. 15-2037)
8

**RICHARDSON, PATRICK, WESTBROOK
& BRICKMAN, LLC**
174 East Bay Street, P.O. Box 879
Charleston, SC 29401
TELEPHONE: (843) 727-6520
FACSIMILE: (843) 727-3103

**KELLER ROHRBACK L.L.P.**
1201 Third Avenue, Suite 3200
Seattle, Washington 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

## C.     Mutual Fund Fees

25.     While mutual fund fees may appear to be very small on a shareholder-by-shareholder basis, they may cause a dramatic decrease in a shareholder's investment returns over time. Arthur Levitt, past Chairman of the United States Securities and Exchange Commission ("SEC"), criticized this "tyranny of compounding high costs":

> Instinct tells me that many investors would be shocked to know how seemingly small fees can over time, create such drastic erosion in returns. . . . In the years ahead, what will mutual fund investors say if they realize too late their returns have fallen hard under the weight of compounding fees?

Arthur Levitt, Jr., *Inaugural Address: Costs Paid with Other People's Money*, 6 Fordham J. Corp. & Fin. L. 259, 261, 267 (2001).

26.     For example, assume that an employee with 35 years until retirement has a current 401(k) account balance of $25,000. If returns on investments in their account over the next 35 years average 7 percent, and fees and expenses reduce their average returns by 0.5 percent, their account balance would grow to $227,000 at retirement, even if there were no further contributions to their account. However, if fees and expenses being withheld are 1.5 percent, their account balance would grow to only $163,000 at retirement. The 1 percent difference in fees and expenses reduces their account balance at retirement by a shocking ***28 percent***.

RICHARDSON, PATRICK, WESTBROOK
& BRICKMAN, LLC
174 East Bay Street, P.O. Box 879
Charleston, SC 29401
TELEPHONE: (843) 727-6520
FACSIMILE: (843) 727-3103

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, Washington 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384



*See A Look at 401(k) Plan Fees*, U.S. Dep't of Labor,

*http://www.dol.gov/ebsa/publications/401k_employee.html* (last visited <u>Dec. 30, 2015</u>).

**D.     Rule 12b-1 Distribution Plans**

27.     Prior to 1980, the use of fund assets (which are owned by the shareholders) to sell

new fund shares was prohibited. The SEC has historically been reluctant to allow fund advisors

to charge their shareholders for selling shares to others:

> [T]he cost of selling and purchasing mutual fund shares should be borne by the
> investors who purchase them and thus presumably receive the benefits of the
> investment, and not, even in part, by the existing shareholders of the fund who
> often derive little or no benefit from the sale of new shares.

"Statement on the Future Structure of the Securities Markets," Sec. Reg. & L. Rep. (BNA) No.

137 pt. II, at 7 (Feb. 2, 1972).

28.     After intense lobbying by the mutual fund industry, the SEC agreed to consider

modifying its objections to allow current fund shareholders to pay distribution expenses. In early

comment letters and in proxy statements proposing adoption of plans of distribution, the mutual

COMPLAINT
(CASE NO. 15-2037)
10

**RICHARDSON, PATRICK, WESTBROOK
& BRICKMAN, LLC**
174 East Bay Street, P.O. Box 879
Charleston, SC 29401
TELEPHONE: (843) 727-6520
FACSIMILE: (843) 727-3103

**KELLER ROHRBACK L.L.P.**
1201 Third Avenue, Suite 3200
Seattle, Washington 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

1    fund industry argued that adding assets to an existing mutual fund would generate economies of

2    scale that would allow the advisors to provide the same quality and nature of services to mutual

3    fund shareholders at dramatically lower costs.

4         29.    Accepting the mutual fund industry's argument that a growth in assets would lead

5    to a *quid pro quo* reduction in advisory fees and other expenses, the SEC tentatively approved

6    Rule 12b-1, 17 C.F.R. § 270.12b-1. However, numerous conditions were attached to the use of

7    fund assets to pay distribution expenses because the SEC wanted to be certain that investment

8    advisors would not "extract additional compensation for advisory services by excessive

9    distributions under a 12b-1 plan." *Meyer v. Oppenheimer Mgmt. Corp.*, 895 F.2d 861, 866 (2d

10   Cir. 1990).

11        30.    As a result, distribution plans must be reviewed annually by a fund's trustees. In

12   particular, the trustees must "request and evaluate . . . such information as may reasonably be

13   necessary to an informed determination of whether such plan should be implemented or

14   continued." 17 C.F.R. § 270.12b-1(d). In addition, minutes must be maintained to record all

15   aspects of the trustees' deliberations, and the trustees must conclude "in light of their fiduciary

16   duties under state law and under sections 36(a) and (b) (15 U.S.C. § 80a-35(a) and (b)) of the

17   [ICA], that there is a reasonable likelihood that the plan will benefit the company and its

18   shareholders." 17 C.F.R. § 270.12b-1(e).

19        31.    Unfortunately, notwithstanding the mutual fund industry's assurances concerning

20   the *quid pro quo* that shareholders would realize from their payment of distribution fees, the

21   SEC's historical concerns have been borne out. A report written by Dr. Lori Walsh, financial

22   economist at the SEC, studied "whether shareholders do, in fact, reap the benefits of 12b-1

23   plans." Her report states:

24

**RICHARDSON, PATRICK, WESTBROOK
& BRICKMAN, LLC**
174 East Bay Street, P.O. Box 879
Charleston, SC 29401
TELEPHONE: (843) 727-6520
FACSIMILE: (843) 727-3103

**KELLER ROHRBACK L.L.P.**
1201 Third Avenue, Suite 3200
Seattle, Washington 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

> Prior studies have provided evidence that shareholders are not receiving sufficient benefits from expense scale economies to offset the 12b-1 fee. In fact most of the studies show that expense ratios are higher for funds with 12b-1 fees by almost the entire amount of the fee. This study confirms these results using a more recent dataset. . .
>
> In all, the evidence demonstrates that 12b-1 plans are successful at attaining faster asset growth; however, shareholders do not obtain any of the benefits from the asset growth. This result validates the concerns raised by opponents of 12b-1 plans about the conflicts of interest created by these plans. . .

Lori Walsh, *The Costs and Benefits to Fund Shareholders of 12b-1 Plans: An Examination of Fund Flows, Expenses and Returns*, SEC, 4, 18 (2004), http://www.sec.gov/rules/proposed/s70904/lwalsh042604.pdf.

32.     Other academic studies of funds sold through brokers versus direct-sold funds have confirmed that not only do shareholders not obtain the benefits of asset growth from the 12b-1 plans, but the broker-sold funds actually deliver *lower* risk-adjusted returns, even before subtracting for distribution costs. Daniel Bergstresser, et al., *Assessing the Costs and Benefits of Brokers in the Mutual Fund Industry*, 22 Rev. Fin. Stud. 4129 (2009).

## IV.     PIMCO BACKGROUND

### A.     PIMCO Fund Complex

33.     As set forth above, the Total Return Fund is held in the PIMCO Trust. A unitary Board of Trustees (the "Board") oversees the PIMCO Trust and all the funds within it. The Board also oversees four other PIMCO trusts (the PIMCO Variable Insurance Trust, the PIMCO ETF Trust, the PIMCO Equity Series, and the PIMCO Equity Series VIT) that are considered part of a family of PIMCO funds referred to as the "Fund Complex."[3] As of December 7, 2015, there are 177 PIMCO funds within the Fund Complex. *See* PIMCO Funds, Statement of

---

[3] All of the trustees oversee the PIMCO Trust, the PIMCO Variable Insurance Trust, and the PIMCO ETF Trust, but only two of the trustees (one disinterested and one interested trustee) serve on the Board that oversees the PIMCO Equity Series and PIMCO Equity Series VIT. 2014 SAI at 68-69.

Additional Information, at 1, 68-69 (July 31, 2015, as supplemented Dec. 7, 2015) ("2014 SAI").

At the close of the fiscal year 2014 (March 31, 2015), the PIMCO Total Return Fund held over

$116 *billion* in assets under management, while the PIMCO Trust held over $1.5 *trillion* in assets

under management. *See* PIMCO Annual Report (Mar. 31, 2015) at 18 (AUM for Total Return

Fund); 2014 SAI at 77 (total AUM for Fund Complex).

**B.   Turmoil at PIMCO and the Fund**

34.    PIMCO's Total Return Fund is "the most ubiquitous fund in the 401(k)

marketplace," according to Mike Alfred, chief executive at BrightScope, which tracks retirement

funds. Kathleen Pender, *Without Gross, is Pimco Total Return Worth Owning?*, SF Gate, Oct. 2,

2014, http://www.sfgate.com/business/networth/article/Without-Gross-is-Pimco-Total-Return-

worth-owning-5795053.php.

35.    William H. ("Bill") Gross, PIMCO's founder and former chief investment officer,

started the Fund in May 1987. The Fund has enjoyed a massive influx in new investors over the

years. At the end of fiscal year 2003, the Fund had $76 billion in assets under management,

which mushroomed to $230 billion in assets under management by the end of fiscal year 2013.

At its peak, the Fund had over $292 billion in assets under management in April 2013.

36.    But as the increase in assets in the Fund led to larger and larger amounts of

compensation being paid to the Defendants, the Fund's performance suffered. In 2012, the Fund

failed to outperform its benchmark, and 60% of the Fund's peers outperformed the Fund. In

2013, the Fund lost 1.92% and trailed 70% of its peers in its worst performance since 1994. E.

Scott Reckard, *Pimco Trustee Assails Exec's Salary*, L.A. Times, Mar. 11, 2014,

http://www.latimes.com/business/la-fi-pimco-gross-pay-20140311-story.html. In Calendar Year

2013, the Fund performed terribly. For example, shareholders in Class A of the Fund saw returns

of -5.97% before taxes, while shareholders of Class B shares saw returns of -6.36% before taxes.

COMPLAINT
(CASE NO. 15-2037)
13

**RICHARDSON, PATRICK, WESTBROOK
& BRICKMAN, LLC**
174 East Bay Street, P.O. Box 879
Charleston, SC 29401
TELEPHONE: (843) 727-6520
FACSIMILE: (843) 727-3103

**KELLER ROHRBACK L.L.P.**
1201 Third Avenue, Suite 3200
Seattle, Washington 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

*See* PIMCO Funds, Prospectus, at 30 (July 31, 2014, as supplemented Oct. 21, 2014). <u>In Calendar year 2014, shareholders in Class A of the Fund saw returns of only 0.37% before taxes. PIMCO Funds, Prospectus, at 29 (July 31, 2015 as supplemented Dec. 7, 2015).</u>

37.     The Fund's poor performance has shaken up management at PIMCO. In early 2014, co-Chief Investment Officer and co-Chief Executive Officer Mohamed El-Erian announced his departure after purportedly butting heads with Bill Gross over management of the Fund. Bill Gross reportedly began to lose control of the firm he created and became increasingly erratic in his management of the Fund. Indeed, before resigning, El-Erian reportedly said to Gross, in front of more than a dozen colleagues: "I am tired of cleaning up your shit." Gregory Zuckerman and Kirsten Grind, *Inside the Showdown Atop Pimco, the World's Biggest Bond Firm*, The Wall St. J., Feb. 24, 2014. And in a shocking development, Gross himself <u>quit or was forced to</u> quit on September 26, 2014, leaving to join competitor Janus Capital Group. News of both El-Erian's and Gross's departures compounded the poor results of the Fund and led to billions of dollars in redemptions from the Fund. As of September 2014, the Fund had seen outflows of investors for 16 months, totaling over $60 billion in redemptions. Kristen Grind, *Pimco Seeks Replacements for Two Total Return Trustees*, Wall St. J., Sept. 15, 2014, http://www.wsj.com/articles/pimco-seeks-replacements-for-two-total-return-fund-trustees-1410810393. <u>Heavy redemptions from the Fund continued through mid-2015, with a total of $122.5 billion in outflows from September 2014 through July 2015. Morningstar, Stewardship Grade for Fund Firms PIMCO: *PIMCO is in better shape than expected but isn't yet out of the woods.* 2, 7 (June 3, 2015) ("2015 Morningstar Stewardship Report"); Morningstar Direct U.S. Asset Flows Update 6 (Aug. 14, 2015), available at http://corporate.morningstar.com/us/documents/pr/AssetFlowsAug2015.pdf.</u>

COMPLAINT
(CASE NO. 15-2037)
14

**RICHARDSON, PATRICK, WESTBROOK & BRICKMAN, LLC**
174 East Bay Street, P.O. Box 879
Charleston, SC 29401
TELEPHONE: (843) 727-6520
FACSIMILE: (843) 727-3103

**KELLER ROHRBACK L.L.P.**
1201 Third Avenue, Suite 3200
Seattle, Washington 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

1   38.    Notwithstanding this poor performance, the compensation PIMCO has received

2   for its work for the Fund and Fund Complex has remained extraordinary and has led to shocking

3   payments to its executives. In 2013 alone, PIMCO paid over *$1.5 billion* in bonus compensation

4   to its top executives. In 2013, Bill Gross and Mohamed El-Erian, PIMCO's now-ex co-CIOs and

5   co-CEOs, reportedly each received *over half a billion dollars* in bonus compensation ($290

6   million to Gross and $230 million to El-Erian). In a lawsuit he recently filed against PIMCO, Mr.

7   Gross alleges that he was "on track to receive a bonus in excess of approximately $250 million"

8   in 2014 had he not been forced to leave the company. Complaint in *Gross v. Pacific Investment*

9   *Management Company LLC*, Case No. 30-2015-00813636-CU-BC-CJC (Super. Ct. Cal. Orange

10   Cty. Oct. 8, 2015) (available at

11   http://www.firstlegalnetwork.com/perm/efile/confirmedCopy/52629/2816995_Complaint%200.p

12   df ("Gross Complaint") at ¶ 77. PIMCO claims that the compensation it pays "is designed to pay

13   competitive compensation and reward performance, integrity and teamwork consistent with the

14   firm's mission statement." 2013 SAI at 95. But no other executive officer of a peer publicly-

15   traded financial company came close to either of these bonuses on an individual level. In fact,

16   one must aggregate the compensation of the CEOs of 20 publicly-held peer finance companies to

17   come close to the amount of money Gross *alone* took home in 2013. *See* Barry Ritholtz, *Guess*

18   *How Much Money Bill Gross Made Last Year*, BloombergView, Nov. 14, 2014,

19   http://www.bloombergview.com/articles/2014-11-14/guess-how-much-money-bill-gross-made-

20   last-year. And on a per-employee basis, PIMCO generates four times as much revenue as

21   Goldman Sachs. *Id.*

22   38a.   On October 8, 2015, Bill Gross filed suit against PIMCO in California state court,

23   shedding light on the circumstances surrounding his abrupt departure. In his complaint, Mr.

24

**RICHARDSON, PATRICK, WESTBROOK
& BRICKMAN, LLC**
174 East Bay Street, P.O. Box 879
Charleston, SC 29401
TELEPHONE: (843) 727-6520
FACSIMILE: (843) 727-3103

**KELLER ROHRBACK L.L.P.**
1201 Third Avenue, Suite 3200
Seattle, Washington 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

Gross alleges that he was forced out of PIMCO in part due to philosophical differences about Fund fees and the interests of Fund shareholders. *See* Gross Complaint at ¶¶ 43-55. The lawsuit outlines PIMCO's efforts to increase fees charged to the Fund solely for PIMCO's benefit and to the detriment the Fund shareholders—in contravention of PIMCO's fiduciary duties to the Fund and its shareholders. *Id.* In particular, Mr. Gross alleges that other high-ranking executives at PIMCO favored a high-risk, high-fee investment model that focused on increasing fees paid by Fund investors to generate additional profits and revenue for PIMCO and its executives. *Id.* According to Mr. Gross, the efforts to raise annual fees on various PIMCO Funds, including the Fund, was accomplished "through creatively labeling such fees 'administrative costs.'" *Id.* at ¶ 53. Consistent with Mr. Gross's allegations, a recent article about the Gross lawsuit reports that Douglas Hodge, PIMCO's chief executive, argued that PIMCO should "'maximize wallet share' and 'fend off fee pressures.'" *See* Landon Thomas, Jr., *Pimco Suit Sheds Light on Murky Investor Fees*, N.Y. Times, Nov. 9, 2015 (available at http://www.nytimes.com/2015/11/10/business/dealbook/pimco-suit-sheds-light-on-murky-investor-fees.html).

39.    Controversy surrounding the amount of compensation paid to Gross led to the departure of a 23-year Board veteran, William Popejoy, who was forced to resign after butting heads with Bill Gross. E. Scott Reckard, *Morningstar Cuts PIMCO Fund Rating From Gold to Bronze After Gross Exit*, L.A. Times, Sept. 30, 2014, http://www.latimes.com/business/la-fi-morningstar-downgrades-pimco-20140930-story.html. Before being removed from the Fund's Board, Popejoy publicly criticized Gross's compensation, stating "I don't know what Bill [Gross] should be paid, but $200 million is not appropriate." E. Scott Reckard, *PIMCO Trustee Assails Exec's Salary*, L.A. Times, March 11, 2014, http://www.latimes.com/business/la-fi-

RICHARDSON, PATRICK, WESTBROOK
& BRICKMAN, LLC
174 East Bay Street, P.O. Box 879
Charleston, SC 29401
TELEPHONE: (843) 727-6520
FACSIMILE: (843) 727-3103

pimco-gross-pay-20140311-story.html. He elaborated: "[y]ou could hire 2,000 schoolteachers for that money." *Id.*

## V.    SUBSTANTIVE ALLEGATIONS

40.     Defendants have breached their fiduciary duty pursuant to Section 36(b) of the ICA with respect to their receipt of investment advisory fees, supervisory and administrative fees, and distribution and servicing fees from the Total Return Fund because under "all the circumstances," the fees they received were unfair to the beneficiaries, i.e., the shareholders of the Fund, such as Plaintiff Kenny.

41.     An investment advisor's fiduciary duty requires both full disclosure and substantive fairness. *See Jones*, 559 U.S. at 336 (a court's evaluation of whether an adviser has breached its fiduciary duty "must take into account both procedure and substance"). Indeed, an advisor "may not overreach in the amount of his fee even though the other party to the transaction, in full possession of all the facts, does not believe the fee is excessive." December 17, 1969 Letter from the Investment Company Institute included with Mutual Funds Amendments (Part I): Hearings Before the Subcomm. on Commerce and Finance of the H. Comm. on Interstate and Foreign Commerce, 91st Cong., at 441 (1969) ("1969 Hearings"). *See also* S. Rep. 91-184, at 15-16 ("the ultimate test, *even if the compensation or payments are approved by the directors and stockholders*, . . . will be whether the investment adviser has fulfilled his fiduciary duty to the mutual fund shareholders in determining the fee") (emphasis added).

42.     The essence of a claim for unfair fees is "'whether or not under all the circumstances the transaction carries the earmarks of an arm's length bargain.'" *Jones*, 559 U.S. at 347 (quoting *Pepper v. Litton*, 308 U.S. 295, 306-307 (1939)). A breach of fiduciary duty occurs "when a fiduciary permits an unreasonable or excessive fee to be levied on the fund,"

COMPLAINT
(CASE NO. 15-2037)
17

**RICHARDSON, PATRICK, WESTBROOK & BRICKMAN, LLC**
174 East Bay Street, P.O. Box 879
Charleston, SC 29401
TELEPHONE: (843) 727-6520
FACSIMILE: (843) 727-3103

**KELLER ROHRBACK L.L.P.**
1201 Third Avenue, Suite 3200
Seattle, Washington 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

1969 Hearings at 189, or "when compensation to the adviser for his services is excessive, in view of the services rendered—where the fund pays what is an unfair fee under the circumstances." *Id.* at 190.

43.     In the case of fees that involve a conflict of interest, such as here, this standard requires both fair dealing and a fair price. "An adviser's compliance or noncompliance with its disclosure obligations is a factor that must be considered in calibrating the degree of deference that is due a board's decision to approve the adviser's fees." *Jones*, 559 U.S. at 351. Thus, under general fiduciary law, a fee that is not the result of a fair process must be given greater scrutiny.

44.     In *Pepper v. Litton*, 308 U.S. 295 (1939), former SEC Chairman Justice Douglas further explained the fiduciary duty standard, as he opined that:

> [fiduciaries'] dealings with the corporation are subjected to rigorous scrutiny and where any of their contracts or engagements with the corporation is challenged the burden is on the [fiduciary] not only to prove the good faith of the transaction but also to show its inherent fairness from the viewpoint of the corporation and those interested therein. *The essence of the test is whether or not under all the circumstances the transaction carries the earmarks of an arm's length bargain.* If it does not, equity will set it aside . . . He who is in such a fiduciary position cannot serve himself first and his cestuis second . . . He cannot use his power for his personal advantage and to the detriment of the stockholders and creditors no matter how absolute in terms that power may be and no matter how meticulous he is to satisfy technical requirements. For that power is at all times subject to the equitable limitation that it may not be exercised for the aggrandizement, preference, or advantage of the fiduciary to the exclusion or detriment of the cestuis. Where there is a violation of those principles, equity will undo the wrong or intervene to prevent its consummation.

*Pepper*, 308 U.S. at 306-311 (emphasis added). In *Jones*, the United States Supreme Court held the formulation of the concept of fiduciary duty stated in Pepper "expresses the meaning of the phrase 'fiduciary duty' in § 36(b) . . . ." 559 U.S. at 347. Thus, by adopting *Pepper*, the Supreme Court adopted a fiduciary duty standard for Section 36(b) that requires both good faith in the negotiation process *and* a fair outcome.

COMPLAINT
(CASE NO. 15-2037)
18

**RICHARDSON, PATRICK, WESTBROOK
& BRICKMAN, LLC**
174 East Bay Street, P.O. Box 879
Charleston, SC 29401
TELEPHONE: (843) 727-6520
FACSIMILE: (843) 727-3103

**KELLER ROHRBACK L.L.P.**
1201 Third Avenue, Suite 3200
Seattle, Washington 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

45.     Factors which may be relevant to determining whether Defendants have breached their fiduciary duty pursuant to Section 36(b) include, but are not limited to: (1) size of the fees; (2) the extent to which benefits derived from the economies of scale realized as the fund grows have inured to the benefit of fund shareholders; (3) the nature and quality of the services rendered; (4) comparative fee structures; (5) the profitability of the funds to the advisor/manager; (6) fallout benefits (i.e. all benefits directly or indirectly received by persons affiliated with an investment company and their affiliated persons by virtue of their relationship with an investment company); and (7) the care and conscientiousness of the directors. A review of these factors, referred to herein as the "*Gartenberg* factors," and the facts in this case, demonstrates that the fees charged by Defendants to the Fund violate Section 36(b).

A.     **Size of Fees Paid by the Fund to PIMCO**

46.     Defendants provide the Fund with four purportedly different services for which they receive compensation from four distinct fees. Within the Total Return Fund, there are eight classes of shares which roughly fall into two classes: institutional[4] and retail[5] shares. The institutional shares are "offered primarily for direct investment by investors such as specified benefit plans, endowments, foundations, corporations and high net worth individuals that can meet the minimum investment amount." 2013 SAI at 101. *See also* 2014 SAI at 104. The minimum investment for institutional shareholders (including the Institutional, Administrative and P Classes) is $1 million per account. 2013 SAI at 121; 2014 SAI at 122. Minimum investment levels are lower for the retail share classes. With certain small exceptions, all shareholders pay the four fees, but the rates vary from class to class.

---

[4] This includes both Institutional, Administrative, and P classes of shares.

[5] This includes Class A, B, C, D, and R share classes.

COMPLAINT
(CASE NO. 15-2037)
19

**RICHARDSON, PATRICK, WESTBROOK & BRICKMAN, LLC**
174 East Bay Street, P.O. Box 879
Charleston, SC 29401
TELEPHONE: (843) 727-6520
FACSIMILE: (843) 727-3103

**KELLER ROHRBACK L.L.P.**
1201 Third Avenue, Suite 3200
Seattle, Washington 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

47.     The compensation PIMCO receives is calculated based on fee rates (or basis points) assessed on the average daily net assets attributable to each class of shares. The following chart summarizes the current fee rates charged by share class:

| Class | Collected by PIMCO | | Collected by PIMCO Investments LLC | | |
| | Investment Advisor Fee | Supervisory and Administrative Fee | Distribution Fee | Servicing Fee | Total Fees |
|---|---|---|---|---|---|
| Administrative | 0.25% | 0.21% | 0.25% | -- | 0.71% |
| Institutional | 0.25% | 0.21% | -- | -- | 0.46% |
| A | 0.25% | 0.35% | -- | 0.25% | 0.85% |
| B[6] | 0.25% | 0.35% | 0.75% | 0.25% | 1.60% |
| C | 0.25% | 0.35% | 0.75% | 0.25% | 1.60% |
| D | 0.25% | 0.25% | 0.25% | -- | 0.75% |
| P | 0.25% | 0.31% | -- | -- | 0.56% |
| R | 0.25% | 0.35% | 0.25% | 0.25% | 1.10% |

48.     Instead of being charged a distribution fee, Class A shareholders are charged an upfront sales charge or "load fee" as follows:

| Sales Range (USD) | | Fee % |
|---|---|---|
| Under $100,000 | | 3.75% |
| $100,000 but under $250,000 | | 3.25% |
| $250,000 but under $500,000 | | 2.25% |
| $500,000 but under $1 million | | 1.75% |
| >$1 million | | 0.00% |

---

[6] As of March 31, 2015, all Class B shares were converted to Class A shares and all Class B shares discontinued.

COMPLAINT
(CASE NO. 15-2037)
20

RICHARDSON, PATRICK, WESTBROOK
& BRICKMAN, LLC
174 East Bay Street, P.O. Box 879
Charleston, SC 29401
TELEPHONE: (843) 727-6520
FACSIMILE: (843) 727-3103

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, Washington 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

49.     Defendants' fee rates have changed little since at least 2003. In 2004, the Board approved raising the Distribution fee rate for Class C shares to 0.75% from 0.65% and it also approved forcing the Class B shareholders to pay a Distribution fee rate of 0.75% where no such fee was previously imposed. In 2006, the Supervisory and Administrative Fees doubled for Class D shares from 0.25% to 0.50%. In 2008, the Supervisory and Administrative Fee was raised from 0.18% to 0.21% for the Administrative and Institutional shares. Also in 2008, the Supervisory and Administrative Fee was raised from 0.18% to 0.31% for the Class P shares. In 2010, the Supervisory and Administrative fee rate was reduced from 0.50% to 0.25% for Class D shares. And effective May 2011, the Supervisory and Administrative Fee rate was reduced from 0.40% to 0.35% for Class A, B, C, and R shares. <u>Effective March 25, 2015, all Class B shares were converted to Class A shares and the Class B shares were discontinued. PIMCO Funds Supplement dated February 25, 2015 to 2014 SAI</u>.

### 1.     Investment Advisory, Supervisory and Administrative Fees

50.     The first fee Defendant PIMCO charges is an investment advisory fee. Pursuant to an "Investment Advisory Contract," Defendant PIMCO charges each fund an advisory fee. Defendant PIMCO claims that the advisory fee reimburses it for making investment decisions, placing orders for the purchase and sale of the Trust's investments, and furnishing the Board with periodic reports on the investment performance of the Fund.

51.     The second fee Defendant PIMCO charges is a supervisory and administrative fee. Pursuant to the "Supervision and Administration Agreement," Defendant PIMCO is the "Administrator of the Funds" for which it charges a supervisory and administrative fee. Defendant PIMCO claims that the supervisory and administrative fee reimburses it for a variety costs, including communicating with shareholders, regulatory compliance, and general "supervision of the operations of the Funds, including coordination of the services performed by

COMPLAINT
(CASE NO. 15-2037)
21

**RICHARDSON, PATRICK, WESTBROOK
& BRICKMAN, LLC**
174 East Bay Street, P.O. Box 879
Charleston, SC 29401
TELEPHONE: (843) 727-6520
FACSIMILE: (843) 727-3103

**KELLER ROHRBACK L.L.P.**
1201 Third Avenue, Suite 3200
Seattle, Washington 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

1  the Funds' transfer agent, custodian, legal counsel, independent registered public accounting

2  firm, and others." 2013 SAI at 81; 2014 SAI at 85.

3      52.     For the fiscal years 2013 and 2014, Defendant PIMCO received the following

4  compensation from the Fund and its shareholders for these fees:

FISCAL YEAR 2013

| Received by PIMCO | | |
|---|---|---|
| Investment Advisor | Supervisory and Administrative Fee | Total Received |
| $641,047,907 | $608,321,040 | **$1,249,368,137** |

FISCAL YEAR 2014

| **Received by PIMCO** | | |
|---|---|---|
| **Investment Advisor** | **Supervisory and Administrative Fee** | **Total Received** |
| $467,931,180 | $442,959,575 | **$910,890,755** |

15     53.     By at least May 2011, analysts were criticizing the size of PIMCO's fees for the

16  Fund:

**If you hold Pimco Total Return, sell it. If you don't, but you want to own a
solid bond fund, look for something else**…Total Return charges too much in
light of its size. In particular, the annual expense ratio of 0.75% for Pimco Total
Return D (PTTDX), the share class that's available without a load through many
discount brokers, imposes a large hurdle for Gross and his team to overcome. The
fee is way too high.

Steven Goldberg, *Should You Dump Pimco Total Return?* Kiplinger (May 24, 2011), available at

http://www.kiplinger.com/article/investing/T041-C007-S001-should-you-dump-pimco-total-

return.html (emphasis in original).

RICHARDSON, PATRICK, WESTBROOK
& BRICKMAN, LLC
174 East Bay Street, P.O. Box 879
Charleston, SC 29401
TELEPHONE: (843) 727-6520
FACSIMILE: (843) 727-3103

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, Washington 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

54.     In June 2011, the critiques continued: "Pimco's expense ratios for Total Return are no better than average, which seems ridiculous for a fund so large, and its prospects are worse." Chuck Jaffe, *You don't need Pimco's Bill Gross or his bond fund*, Marketwatch (June 17, 2011), http://www.marketwatch.com/story/you-dont-need-pimcos-bill-gross-or-his-bond-fund-2011-06-17.

55.     Morningstar, the respected provider of independent investment research, has repeatedly raised concerns regarding the Fund's fees, noting in a November 15, 2011 Analyst Report that: "[t]he fund's annual expense bite, at 0.46%, certainly looks reasonable at first blush . . . But we're talking about the largest mutual fund in the world here . . . PIMCO's decision to actually raise the fund's price from 43 basis points a couple of years ago looked downright greedy." Morningstar, PTTRX: Analyst Report, *It's not quite time to start worrying about this Fund,* Nov. 15, 2011. Morningstar repeated this exact same criticism in its June 28, 2012 and September 10, 2012 Analyst Report on the Fund. *See* Morningstar, PTTRX: Analyst Report, *Counting on discretion being the better part of valor*, June 28, 2012; Morningstar, PTTRX: Analyst Report, *A difficult pace to keep*, Sept. 10, 2012.

56.     In September of 2014, Morningstar criticized the Board's approval of the fees PIMCO charges for its investment advisory and related services to the Fund:

> Another elusive issue that falls under the board's domain is the way in which PIMCO accounts for and reports the expenses of its funds. In essence, the firm breaks down the bulk of its funds' costs into the two large line items of "investment advisory fees" and "supervisory and administrative fees." What's especially noteworthy about that construct is the parity between those two line items. The firm's flagship Total Return fund places the issue into sharp focus.
>
> For the fiscal year ended March 2014, Total Return's advisory fees totaled more than $641 million, while its supervisory and administrative fees clocked in at $608 million. *The proximity of those numbers is perplexing simply because the first number should represent what shareholders are paying for the expert, value-added services of an active money manager, while the second should account for*

**RICHARDSON, PATRICK, WESTBROOK
& BRICKMAN, LLC**
174 East Bay Street, P.O. Box 879
Charleston, SC 29401
TELEPHONE: (843) 727-6520
FACSIMILE: (843) 727-3103

*the relatively commodified costs that are otherwise associated with operating a fund and servicing shareholder accounts.*

Even if one were to argue that some providers of "supervisory and administrative" services warrant more compensation than others, it doesn't make sense that the true cost of servicing one of the best-run mutual funds in the history of the business is anywhere remotely close to the fair value of its investment advisory services. Ultimately, though, it's a matter of transparency and allowing shareholders to understand whether the board is doing enough to make sure that investors aren't overpaying for commodified services, and while the annual report does describe what kinds of expenses are included in the "supervisory and administrative fees" line item, it does not break down those costs, as other competitors do.

Morningstar, Stewardship Grade for Fund Firms PIMCO: *The year 2014 is proving to be among PIMCO's most eventful* 6-7 (Sept. 29, 2014) ("2014 Morningstar Stewardship Report") (emphasis added). <u>In its 2015 Stewardship Report, Morningstar continued its criticism of the Fund's Board, again giving PIMCO a grade of "D" for Fund Board Quality. Among its criticisms, Morningstar express concern about the Board's ability to ensure that shareholders are benefitting from economies of scale. *See* 2015 Morningstar Stewardship Report at 6 ("[T]he board might do more to ensure that appropriate economies of scale are being passed to shareholders. . . . These long-standing issues surrounding fee disclosure and economies of scale, combined with the unproven Funds Trust board . . . are still enough to maintain a Board Quality grade of D").</u>

### 2. Distribution Fee and Servicing Fee (12b-1 Fees)

57.     The third and fourth fees Defendant PIMCO Investments LLC charges are a distribution fee and a servicing fee related to three Rule 12b-1 plans adopted for the Fund. Pursuant to a "Distribution and Servicing Plan," Defendant PIMCO Investments LLC serves as the "Distributor" to the Fund. In this role, it serves as the principal underwriter in the continuous public offering of each class of the Fund's shares. The distribution and servicing fees are alleged

1    to cover the cost of acquiring new customers to the Fund and for maintaining new shareholder

2    accounts. *See* 2013 SAI at 102. *See also* 2014 SAI at 105-07.

3        58.    The Distributor charges fees pursuant to three different 12b-1 plans that vary by

4    share class within the Fund. First, for shareholders of Class A, B[7], C, and R shares, the

5    Distributor charges a distribution fee and/or a distinct servicing fee pursuant to a "Distribution

6    and Servicing Plan" that is referred to as the "Retail Plan." Second, for shareholders of

7    Administrative classes, the Distributor charges a combined distribution and servicing fee

8    pursuant "Distribution and Servicing Plan" that is referred to as the "Administrative Class Plan."

9    Third, for shareholders of Class D shares, the Distributor charges a combined distribution and

10   servicing fee pursuant "Distribution and Servicing Plan" that is referred to as the "Class D Plan."

11       59.    And for fiscal years 2013 and 2014, Defendant PIMCO Investments LLC

12   received the following compensation from the Fund and its shareholders:

### FISCAL YEAR 2013

| Received by PIMCO Investments LLC | |
| --- | --- |
| **Class** | **Distribution and Servicing** |
| A | $59,484,781 |
| B | $2,076,223 |
| C | $102,949,249 |
| D | $42,329,466 |
| R | $16,171,568 |
| Administrative | $74,395,003 |
| **Total Received** | **$297,406,290** |

---

[7] Class B shares are no longer offered for sale to new investors or existing investors except through reinvested dividends and exchanges. 2013 SAI at 102. And all Class B shares have been converted to Class A shares effective March 25, 2015. PIMCO Funds Supplement dated February 25, 2015 to 2014 SAI.

**RICHARDSON, PATRICK, WESTBROOK & BRICKMAN, LLC**
174 East Bay Street, P.O. Box 879
Charleston, SC 29401
TELEPHONE: (843) 727-6520
FACSIMILE: (843) 727-3103

**KELLER ROHRBACK L.L.P.**
1201 Third Avenue, Suite 3200
Seattle, Washington 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

1

FISCAL YEAR 2014

| Received by PIMCO Investments LLC | |
|---|---|
| **Class** | **Distribution and Servicing** |
| A | $43,741,197 |
| C | $66,110,445 |
| D | $28,183,397 |
| R | $13,358,842 |
| Administrative | $59,043,555 |
| **Total Received** | **$210,437,436** |

60.     The distribution and servicing fee rates for the Fund have not been reduced in the past 10 years.

61.     As set forth above in ¶ 49, the only changes have been to raise the distribution fee rates and impose them on share classes that had otherwise not paid them.

62.     Furthermore, the distribution fees are based on the net asset value of the Fund and not on the distribution activity, if any, by Defendants, such as number of shares sold. Accordingly, in addition to failing to benefit the Fund and its shareholders, the Distribution Plans have extracted additional compensation for advisory services to Defendants, thereby resulting in excessive compensation received by them.

63.     In relevant part, as the Fund has grown in size, the distribution and servicing fees have grown proportionally, reflecting a failure to pass on economies of scale to the Fund. Between 2003 and 2013, the Fund's assets under management tripled. This is essentially the same for the distribution and servicing fees. For fiscal year 2003 (ending March 31, 2004), the

COMPLAINT
(CASE NO. 15-2037)
26

**RICHARDSON, PATRICK, WESTBROOK
& BRICKMAN, LLC**
174 East Bay Street, P.O. Box 879
Charleston, SC 29401
TELEPHONE: (843) 727-6520
FACSIMILE: (843) 727-3103

**KELLER ROHRBACK L.L.P.**
1201 Third Avenue, Suite 3200
Seattle, Washington 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

Fund paid just shy of $125 million in distribution and servicing fees. Ten years later for fiscal year 2013 (ending March 31, 2014), the total distribution and servicing fees were nearly $300 million. <u>And for fiscal year 2014 (ending March 31, 2015), the total distribution and servicing fees were still well over $200 million, despite the fact the Total Return Fund saw its assets under management fall by nearly 50% from the year before.</u> At no time has the Fund been charged lowered distribution and servicing fees.

64.     Morningstar has also been critical of PIMCO's distribution and servicing fee structure, and has noted that "[b]y and large, fees for [some] PIMCO . . . share classes sold through advisors or directly to investors (as opposed to institutional classes) are not competitive." 2014 Morningstar Stewardship Report at 6-7.

**B.     Economies of Scale**

65.     The size of the compensation received by the advisor should be evaluated in context with the economies of scale realized by a fund. Economies of scale are created when (as with the Total Return Fund) assets under management increase more quickly than the cost of advising and managing those assets. The work required to operate a mutual fund does not increase proportionately with the assets under management.

> [I]nvestment management efforts, the most important (and most expensive) input into portfolio management, do not increase along with portfolio size. A portfolio manager can invest $5 billion nearly as easily as $1 billion and $20 billion nearly as easily as $10 billion. (Size may impair performance, but it imposes little logistical challenge.)

David F. Swensen, *Unconventional Success: A Fundamental Approach to Personal Investment* 238 (2005). Therefore, "[a]s scale increases, fees as a percentage of assets ought to decline, allowing both fund manager and fund shareholders to benefit." *Id.* Indeed, break points "reflect the economic reality of the direct relationship between decreasing marginal costs and increasing portfolio size." *Id.* According to another fund industry expert, John C. Bogle, the economies of

COMPLAINT
(CASE NO. 15-2037)
27

**RICHARDSON, PATRICK, WESTBROOK & BRICKMAN, LLC**
174 East Bay Street, P.O. Box 879
Charleston, SC 29401
TELEPHONE: (843) 727-6520
FACSIMILE: (843) 727-3103

**KELLER ROHRBACK L.L.P.**
1201 Third Avenue, Suite 3200
Seattle, Washington 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

1  scale generated in the mutual fund portfolio management and research business are "little short

2  of staggering." John C. Bogle, *The Battle for the Soul of Capitalism* 154 (2005).

3      66.      As an example, if a fund has fifty million dollars ($50,000,000) of assets under

4  management and an investment advisory fee rate of 25 basis points (100 basis points = 1%), the

5  fee equals $125,000 per year. A comparable mutual fund with five hundred million dollars

6  ($500,000,000) of assets under management would generate a fee of one million two hundred

7  and fifty thousand dollars ($1,250,000). Similarly, a mutual fund worth two hundred billion

8  dollars ($200,000,000,000) would generate an investment advisory fee of ***five hundred million***

9  ***dollars ($500,000,000) per year.***

10     67.      It simply does not cost a fund advisor ten times as much to render services to a ten

11 billion dollar ($10,000,000,000) fund as compared to a one billion dollar ($1,000,000,000) fund.

12 In fact, the investment advisory services or securities selection process for a ten billion dollar

13 fund and a one billion dollar fund are virtually identical, generating enormous economies of

14 scale. At some point, the additional cost to advise each additional dollar in the fund (whether

15 added by a rise in the value of the securities or additional contributions by current or new

16 shareholders) approaches a number at or close to zero.

17     68.      Even the Investment Company Institute, the national association of United States

18 investment companies, recognizes that economies of scale exist in mutual fund management and

19 that, in part, "[m]utual fund expenses [ ] have fallen because of economies of scale." 2014

20 Investment Company Fact Book 87 (2014), available at

21 http://www.ici.org/pdf/2014_factbook.pdf. Further, "[l]arger mutual funds tend to have below-

22 average expense ratios because of economies of scale." *Id.* at 94.

23

24

RICHARDSON, PATRICK, WESTBROOK
& BRICKMAN, LLC
174 East Bay Street, P.O. Box 879
Charleston, SC 29401
TELEPHONE: (843) 727-6520
FACSIMILE: (843) 727-3103

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, Washington 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

69.     The existence of economies of scale in the mutual fund industry has been confirmed by both the SEC and the Governmental Accounting Office (the "GAO"). Both conducted in-depth studies of mutual fund fees, and both concluded that economies of scale exist in the provision of advisory services. *See* SEC Division of Investment Management, Report on Mutual Fund Fees and Expenses 30-31 (Dec. 2000), http://www.sec.gov/news/studies/feestudy.htm ("SEC Report"); GAO, Report on Mutual Fund Fees to the Chairman, Subcommittee on Finance and Hazardous Materials; and the Ranking Member, Committee on Commerce, House of Representatives 9 (June 2000), *available at* http://www.gao.gov/archive/2000/gg00126.pdf ("GAO Report").

70.     In addition, academic research has established the existence of economies of scale that are not being passed along to mutual fund shareholders in violation of Defendants' duty to do so under Section 36(b) and Rule 12b-1. *See* John P. Freeman & Stewart L. Brown, *Mutual Fund Advisory Fees: The Cost of Conflicts of Interest*, 26 J. Corp L. 609, 661 (2001) (the "Freeman & Brown Study"). As the Freeman & Brown Study noted: "The existence of economies of scale has been admitted in SEC filings made by fund managers . . . [f]und industry investment managers are prone to cite economies of scale as justification for business combinations." *Id.* at 620.

71.     These economies of scale exist not only on a fund by fund basis but also exist with respect to an entire fund complex and even with respect to an investment advisor's entire scope of operations, including services provided to institutional and other clients. *See id.* at 621 n.62 (quoting Victoria E. Schonfeld & Thomas M.J. Kerwin, *Organization of a Mutual Fund*, 49 Bus. Law 107 (1993)).

COMPLAINT
(CASE NO. 15-2037)
29

**RICHARDSON, PATRICK, WESTBROOK & BRICKMAN, LLC**
174 East Bay Street, P.O. Box 879
Charleston, SC 29401
TELEPHONE: (843) 727-6520
FACSIMILE: (843) 727-3103

**KELLER ROHRBACK L.L.P.**
1201 Third Avenue, Suite 3200
Seattle, Washington 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

72.     The clearest example of economies of scale occurs when total assets under management increase due purely to market forces (without the institution of new advisory relationships or new asset gathering). In such instances, as the GAO confirms, it is possible for the advisor to service the additional assets with zero additional costs. *See* GAO Report at 9 (noting that growth from portfolio appreciation is unaccompanied by costs). In other words, an investment advisor can advise a fund that doubles in size purely because of market forces with no increased costs because the services are unchanged. *See id.*; Freeman & Brown Study at 619 n.43, 621 (noting that investment advisors have benefited by garnering "increased fees from the general increase in market prices with no commensurate efforts on their part" and also noting that as much as 64% of mutual fund asset growth has come from appreciation of portfolio securities, which, unlike growth from share sales to new investors, is costless).

73.     Industry insiders have also acknowledged that economies of scale exist in fixed income mutual funds such as the Total Return Fund. For example, Vanguard has stated that it "[u]se[s] economies of scale and advanced bond-trading technology to deliver low-cost investment management" with its actively managed fixed income funds. *Fixed Income Investing at Vanguard*, Vanguard, 7 (2009), https://advisors.vanguard.com/iwe/pdf/FASFIXB.pdf (originally cited source no longer available, print copy retained by counsel). *See also Fixed Income ETFs: The Good, The Bad and The Ugly*, ETF.com, 5 (Sept. 2012), http://www.etf.com/docs/presentation2012/FixedIncome/FixedIncomeETFsTheGoodtheBadandtheUgly.pdf.

74.     Economies of scale also exist with regard to the provision of supervisory and administration services. Indeed, in the aggregate, various miscellaneous administrative items (aside from the transfer agency cost) typically do not account for more than three basis points of

COMPLAINT
(CASE NO. 15-2037)
30

**RICHARDSON, PATRICK, WESTBROOK & BRICKMAN, LLC**
174 East Bay Street, P.O. Box 879
Charleston, SC 29401
TELEPHONE: (843) 727-6520
FACSIMILE: (843) 727-3103

**KELLER ROHRBACK L.L.P.**
1201 Third Avenue, Suite 3200
Seattle, Washington 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

the average mutual fund's advisory fee. *See* John P. Freeman, Stewart L. Brown & Steve Pomerantz, *Mutual Fund Advisory Fees: New Evidence and a Fair Fiduciary Duty Test*, 61 Okla. L. Rev. 83, 113 (2008) (the "Freeman, Brown, & Pomerantz Study").

### 1.    PIMCO's Economies of Scale in Investment Advisory Services

75.    In the case of the Fund, assets have grown dramatically over the past ten years, consequently, the investment advisory fees paid to Defendants have grown dramatically, despite the economies of scale realized by Defendants prior to the growth in assets.

76.    Defendants have wrongfully retained the benefits resulting from these economies of scale. These benefits can (at least in part) be shared with the Fund and its shareholders by reducing the advisory and other costs charged to the Fund by Defendants through use of fee breakpoints. For example, for each additional $500 million invested in a fund, the advisor could charge a declining fee rate in order to share economies of scale with the shareholders. And yet, PIMCO has no breakpoints, and thus no meaningful savings have been shared with the Fund.

77.    A review of the Fund's assets under management as compared to the fees it has paid Defendants in Chart A (below) reveals that no economies of scale have been passed to the Fund and its shareholders.



**RICHARDSON, PATRICK, WESTBROOK & BRICKMAN, LLC**
174 East Bay Street, P.O. Box 879
Charleston, SC 29401
TELEPHONE: (843) 727-6520
FACSIMILE: (843) 727-3103

**KELLER ROHRBACK L.L.P.**
1201 Third Avenue, Suite 3200
Seattle, Washington 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

78.     Further, a comparison of the fees as a percentage of the Fund's assets under management reveal that the fees have not decreased as the assets under management change. *See* Chart B (below).



79.     In March 2014, Morningstar raised a continuing concern it had with the Fund's fees in relation to its size and the economies of scale the advisor experiences:

> Even in the wake of notable redemptions in 2013, PIMCO Total Return PTTRX still comprised more than $235 billion in investor assets as of February 2014 and remains the world's largest actively managed mutual fund . . .
>
> [T]he impact of Total Return's size remains an issue that Morningstar continues to study and examine . . .
>
> Arguably just as important to PIMCO's Corporate Culture grade is the cost picture for investors in PIMCO's noninstitutional share classes, in particular. Several are priced high relative to similarly structured peers and sometimes emphatically so relative to the economies of scale that the firm enjoys. It's difficult to pin down why this issue has failed to gain more attention within PIMCO, particularly given Gross' occasional public comments about the headwind of high fund costs—in a 2009 column he referred to 0.75% bond fund expense ratios as an "extreme absurdity." . . .

RICHARDSON, PATRICK, WESTBROOK
& BRICKMAN, LLC
174 East Bay Street, P.O. Box 879
Charleston, SC 29401
TELEPHONE: (843) 727-6520
FACSIMILE: (843) 727-3103

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, Washington 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

PIMCO's noninstitutional share classes sometimes carry fees that are simply too high to recommend, no matter how good the management. And even then, while the funds' institutional shares are competitive on a relative basis with their various cohorts, they tend to lack fee breakpoints—Total Return is a glaring example—and charge a lot more than one might expect given their size. Of all the funds in the marketplace, this enormous portfolio should by all rights boast a truly low expense ratio in its peer group. And that's really the ultimate issue, especially for a fund group that has some of the best economies of scale of any in the world.

Eric Jacobson and Michael Herbst, *Morningstar's Current View on PIMCO*, Morningstar (Mar. 18, 2014), http://ibd.morningstar.com/article/article.asp?id=639535&CN=brf295,http://ibd.morningstar.com/archive/archive.asp?inputs=days=14;frmtId=12,%20brf295. Morningstar echoed this concern in June 2015 when it noted that "historically PIMCO hasn't passed on the benefits of economies of scale of large funds to fund investors via fee breakpoints, as other firms have." 2015 Morningstar Stewardship Report at 4; *see id.* at 8 ("the firm historically has not passed on greater economies of scale for its larger funds (including PIMCO Total Return, until recently the industry's largest) via breakpoints in its fee schedule").

80.    Morningstar also noted the Fund Board's failure to negotiate any breakpoints (and pass along economies of scale to the Fund) in its recent stewardship report:

The opacity of these data, combined with [the Fund's] girth, suggests that the board has not done all that it can to aggressively negotiate for better economies of scale or to at least help investors better understand why the fees they pay are appropriate. That includes not only making sure that cost data are transparent but also that shareholders are getting the best deal possible for the services that are being provided.

These long-standing issues surrounding fee disclosure and economies of scale—PIMCO Total Return doesn't have any management-fee breakpoints, for example—combined with newer concerns about the disruption to the funds' boards and their independence are enough to consider the current quality of the boards inferior and thus earn PIMCO a lowered Board Quality grade of D.

**RICHARDSON, PATRICK, WESTBROOK
& BRICKMAN, LLC**
174 East Bay Street, P.O. Box 879
Charleston, SC 29401
TELEPHONE: (843) 727-6520
FACSIMILE: (843) 727-3103

2014 Morningstar Stewardship Report at 7. <u>In its 2015 Stewardship Report, Morningstar reiterated its concern that the Fund's Board has failed to ensure economies of scale were shared with the Fund's shareholders:</u>

> <u>Meanwhile, the board might do more to ensure that appropriate economies of scale are being passed to shareholders. The funds aren't subject to management-fee breakpoints as assets increase…</u>

> <u>These long-standing issues surrounding fee disclosure and economies of scale, combined with the unproven Funds Trust board …, are still enough to maintain a Board Quality grade of D.</u>

<u>2015 Morningstar Stewardship Report at 6.</u>

### 2. Defendants' Economies of Scale in Supervisory and Administration Services

PIMCO itself touts that it experiences economies of scale on its website and in its advertising materials. For example, PIMCO acknowledges its "substantial market presence, which may result in economies of scale and greater, more efficient access to opportunities." *PIMCO Municipal Bonds <u>Managed Account,</u>* <u>https://www.pimco.com/investments/managed-accounts/municipal-bonds-managed-account (last visited Dec. 30, 2015).</u> PIMCO also claims that "<u>[a]s one of the largest bond managers in the world, economies of scale help us to keep transaction costs very low. Transaction costs are factored into all of our analyses to ensure the opportunity cost of each trade is outweighed by the benefit.</u>" *<u>Strategies, Total Return Strategy,</u>* <u>https://www.pimco.com/investments/strategies/total-return-strategy (last visited Dec. 30, 2015).</u> In fact, PIMCO advertises, "[o]ur municipal bond portfolios also take advantage of PIMCO's substantial market presence, which may provide economies of scale in price and transaction costs—a benefit passed on to our clients." *A New Paradigm for Municipal Investing*, at 5 (Sept. 30, 2014), https://investments.pimco.com/MarketingPrograms/External%20Documents/A_New_Paradigm_for_Municipal_Bond_Investing_PWP003.pdf.

COMPLAINT
(CASE NO. 15-2037)
34

**RICHARDSON, PATRICK, WESTBROOK & BRICKMAN, LLC**
174 East Bay Street, P.O. Box 879
Charleston, SC 29401
TELEPHONE: (843) 727-6520
FACSIMILE: (843) 727-3103

**KELLER ROHRBACK L.L.P.**
1201 Third Avenue, Suite 3200
Seattle, Washington 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

81.     And yet, the economies of scale generated through the provision of supervisory and administration services have not been passed to the Fund as they rightfully should. At the end of Fiscal Year 2003 the Fund had $76 billion in assets under management, and shareholders paid a total of just over $351 million in advisory and supervisory/administrative fees. Ten years later, at the end of Fiscal Year 2013, the Fund more than tripled in size, with over $230 billion in assets under management, and the advisory and supervisory/administrative fees paid by the Fund to Defendants have nearly quadrupled to over $1.24 billion. <u>Moreover, even as the assets under management fell by nearly half between the end of fiscal year 2013 and 2014, the Fund still paid just over $900 million in advisory and supervisory/administrative fees, a reduction of less than 30%.</u>

82.     Defendant charges the Fund shareholders anywhere from 21 to 35 basis points or seven to eleven times more than the typical cost for providing these services (three basis points). *See* Freeman, Brown, & Pomerantz Study at 113.

83.     In a single fiscal year (2013), the Fund shareholders paid Defendant over $600 million for these administrative services alone. <u>And in 2014, the Fund shareholders paid Defendant over $442 million for the administrative/supervisory services.</u>

<u>84a.     Eric Jacobson, an analyst with Morningstar recently was quoted as saying about PIMCO's administrative fees for the Fund: "It's ridiculous and extremely disappointing from a governance perspective. This is the type of thing you farm out to another provider. The cost of the service should not even come close to the cost of investment management." *See* Landon Thomas, Jr., *Pimco Suit Sheds Light on Murky Investor Fees*, N.Y. Times, Nov. 9, 2015, available at http://www.nytimes.com/2015/11/10/business/dealbook/pimco-suit-sheds-light-on-murky-investor-fees.html. And in his complaint against PIMCO, Bill Gross alleged that certain</u>

**RICHARDSON, PATRICK, WESTBROOK
& BRICKMAN, LLC**
174 East Bay Street, P.O. Box 879
Charleston, SC 29401
TELEPHONE: (843) 727-6520
FACSIMILE: (843) 727-3103

PIMCO executives carried out their plan to raise fees paid by investors, and profit to PIMCO, by raising annual fees for the Fund by labeling them as "administrative costs." Gross Complaint at ¶¶ 53, 54.

### 3. Defendants' Economies of Scale in Distribution and Servicing Fees

84.     Advances in computing and communication technologies in the past twenty years have resulted in exponential efficiencies that have dramatically reduced the costs of servicing mutual funds in ways Congress could not have imagined when it enacted ICA Section 36(b).

85.     Despite the dramatic growth in assets Defendants manage, the fees charged for distribution and servicing have only increased. *See supra* § V.A. Accordingly, the Distribution Plan with the Distributor (PIMCO Investments LLC) has produced little or no economies-of-scale benefits to the shareholders of the Fund. Rather, the Distribution Plan has served Defendants, just as the SEC feared when it found that "the use of mutual fund assets to finance distribution activities would benefit mainly the management of a mutual fund rather than its shareholders, and therefore that such use of fund assets should not be permitted." Bearing of Distribution Expenses by Mutual Funds, Investment Company Act Release No. 9915, 1977 WL 190477 (Aug. 31, 1977). As a result, the Distribution Plan violates the intent and purpose of Rule 12b-1 and is a waste of Fund assets.

86.     Despite the fact that Plaintiff and the other shareholders of the Fund have enjoyed no benefits from the Distribution Plan, even though they contributed to the growth of fund assets by paying distribution fees, and despite the fact that the Distribution Plan has allowed Defendant PIMCO Investments LLC to extract additional and excessive compensation from Plaintiff and other shareholders of the Fund, the Board has continued to approve, year after year, the continuation of the Distribution Plans in violation of Section 36(b). In turn, Defendants have

COMPLAINT
(CASE NO. 15-2037)
36

**RICHARDSON, PATRICK, WESTBROOK & BRICKMAN, LLC**
174 East Bay Street, P.O. Box 879
Charleston, SC 29401
TELEPHONE: (843) 727-6520
FACSIMILE: (843) 727-3103

**KELLER ROHRBACK L.L.P.**
1201 Third Avenue, Suite 3200
Seattle, Washington 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

reaped additional and excessive compensation while failing to pass on any savings from economies of scale they experience to the Fund, Plaintiff, or the other Fund shareholders.

## C.     Comparative Fee Structure

87.     "In order to determine whether a fee is excessive for purposes of Section 36(b), a court must examine the relationship between the fees charged and the services rendered by the investment adviser." *Krantz v. Prudential Inv. Fund Mgmt., LLC*, 305 F.3d 140, 143 (3d Cir. 2002) (citations omitted). To facilitate this comparison, Plaintiff compares the Fund's fees to fees charged by the Defendants to three other PIMCO clients: PIMCO's private clients, Harbor Capital Advisor's Harbor Bond Fund sub-advised by PIMCO, and the PIMCO Total Return Fund ETF. All three of these comparators present the "range of fees" that might result from arm's-length bargaining and present a benchmark for reviewing the compensation received by PIMCO for the Fund. *See Jones*, 559 U.S. at 347 (citing *Gartenberg*, 694 F.2d at 929).

### 1.     Rates charged by PIMCO to Private Clients

88.     A mutual fund is a single client relationship for the Defendants, as with any other institutional client. Accordingly, with respect to the advisory and supervisory and administrative fees, a mutual fund is no different from any other institutional investor.

89.     The investment advisory services Defendants provide to the Fund are simple to summarize: Defendants buy and sell, at their discretion, securities for the funds.

90.     Morningstar has concluded that there should be no difference between management fees charged to mutual funds (retail products) and other institutional clients:

> Fees for a firm's retail products should not be materially different from management fees for a firm's institutional offerings. Though we appreciate the added costs of servicing small accounts, those expenses needn't show up in the management fees.

RICHARDSON, PATRICK, WESTBROOK
& BRICKMAN, LLC
174 East Bay Street, P.O. Box 879
Charleston, SC 29401
TELEPHONE: (843) 727-6520
FACSIMILE: (843) 727-3103

Kunal Kapoor, *A High Hurdle: Our Criteria for Picking Funds*, Morningstar (Dec. 4, 2003), http://news.morningstar.com/articlenet/article.aspx?id=100812.

91.    Defendants provide investment advisory services to a variety of private clients outside of those who invest in the Fund or the Fund Complex. The same portfolio managers of the Total Return Fund also provide private investors who have at least $75 million the opportunity to invest in essentially the same fund with lower fees charged. *See* 2013 SAI, at 88-91.[8] To such investors, PIMCO provides access to invest in a "Total Return" fund that, on information and belief, contains the same or substantially similar underlying investments as those that compose the Fund. *Compare* PIMCO Form ADV Part 2A Brochure 2014 at 38 *with* PIMCO Funds, Prospectus, at 28 (July 31, 2014). *Compare also* PIMCO Form ADV Part 2A Brochure 2014 at 39 *with* PIMCO Funds, Prospectus, at 27-28 (July 31, 2015 updated Dec. 7, 2015).

92.    Defendants charge these private investors much lower fee rates than Plaintiff and the Fund pay for the same investment advisory services. Moreover, unlike the Fund, PIMCO offers significant breakpoints in their fee rates for these clients. That is, PIMCO recognizes and shares the economies of scale with these private investors, a practice that it does not employ with the Fund and the Fund's shareholders. Private investors may select between two fee schedules: (1) a fixed fee or (2) performance fee. PIMCO Form ADV Part 2A Brochure 2014 at 33; PIMCO Form ADV Part 2 Brochure 2015 at 39. Under the "fixed fee" schedule, the investor must invest at least $75 million. The investor then pays PIMCO a fee of 0.50% on the first $25 million, 0.375% on the next $25 million and then 0.25% on all amounts over $50 million in the investor's

---

[8] These accounts are reported as "Other Accounts," and only the number of such accounts and the total assets of all such accounts are reported.

COMPLAINT
(CASE NO. 15-2037)
38

**RICHARDSON, PATRICK, WESTBROOK
& BRICKMAN, LLC**
174 East Bay Street, P.O. Box 879
Charleston, SC 29401
TELEPHONE: (843) 727-6500
FACSIMILE: (843) 727-3103

**KELLER ROHRBACK L.L.P.**
1201 Third Avenue, Suite 3200
Seattle, Washington 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

1    account. These breakpoints are significant. A private investor with $100 million to invest may

2    elect to pay a performance fee that has a "Base Fee" of 0.15% plus a payment of 15% of any

3    "outperformance over the applicable index plus the Base Fee." PIMCO Form ADV Part 2A

4    Brochure 2014 at 33. *See also* PIMCO Form ADV Part 2A Brochure at 39.

5        93.    The favorable rates incorporating breakpoints that private investors enjoy produce

6    huge savings relative to what shareholders in the Fund pay in annual fees. A simple example

7    illustrates this point. A private investor who invests $200 million in a private Total Return

8    account pays $593,750 in annual fees to PIMCO (using the fixed fee schedule). Yet an investor

9    with $200 million in A Class shares in the Fund will pay **$1.7 million** in annual fees, while a

10   person investing $200 million in either B or C Class shares in the Fund will pay a whopping **$3.2**

11   **million** in annual fees. Even an investor in the Fund's "Institutional" share class who invests

12   $200 million will still pay $920,000 in annual fees—nearly twice what a private investors will

13   pay under the fixed fee schedule. Upon information and belief, the underlying investments for

14   both private investors and Fund shareholders are not materially different and the nature and

15   quality of the investment services Defendants provide are indistinguishable. Yet, investors in the

16   Fund pay an unjustifiably larger amount to Defendants because they enjoy no economies of

17   scale, including, for example, no breakpoints.

18       94.    Unlike Plaintiff and investors in the Fund, these private clients have the ability to

19   negotiate at arm's length—a luxury not afforded to Plaintiff and the Fund's shareholders. This

20   permits private investors to enjoy even greater savings relative to what shareholders in the Fund

21   pay in fees.

22       95.    PIMCO discloses that under either the fixed fee or the performance fee, the

23   private investor can negotiate the fees "under certain circumstances" that it does not explain

24

**RICHARDSON, PATRICK, WESTBROOK
& BRICKMAN, LLC**
174 East Bay Street, P.O. Box 879
Charleston, SC 29401
TELEPHONE: (843) 727-6520
FACSIMILE: (843) 727-3103

**KELLER ROHRBACK L.L.P.**
1201 Third Avenue, Suite 3200
Seattle, Washington 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

1  further. PIMCO Form Adv. Part 2A Brochure 2014 at 33; PIMCO Form Adv. Part 2A Brochure

2  2015 at 38.

3      96.     Under either the fixed fee or performance fee schedule, private investors receiving

4  the same investment advisory services pay substantially less than Fund shareholders. If one

5  excludes distribution and servicing fees, *Fund shareholders are paying between two and three*

6  *times as much as private investors*. If one includes the distribution fees, *Fund shareholders are*

7  *paying between two and five times as much as private investors for the same services.* And none

8  of the Fund shareholders receive breakpoints. Nor do they have the ability to negotiate the fees.

9          **2.      Rates charged by PIMCO for sub-advising the Harbor Bond Fund**

10     97.     The Harbor Bond Fund, a bond fund with a "total return" investment goal, is

11  offered by Harbor Capital Advisors, Inc. to investors. The board of trustees who oversees the

12  Harbor Bond Fund oversees 29 funds in their complex and have eight independent trustees

13  overseeing the funds, with only one additional insider trustee.

14     98.     Defendant PIMCO provides sub-advisory services to the Harbor Bond Fund. In

15  fact, until he left PIMCO, Bill Gross sub-advised the Harbor Bond Fund since its inception in

16  1987.[9] When asked at an interview about the difference between the Harbor Bond Fund and the

17  Total Return Fund, Gross responded, "There's not much difference at all, other than size and

18  fees." *Bill Gross: Harbor Bond Fund*, Bloomberg Businessweek (Mar. 29, 2006),

19  http://www.businessweek.com/stories/2006-03-29/bill-gross-harbor-bond-fundbusinessweek-

20  business-news-stock-market-and-financial-advice.

---

[9] After Gross left PIMCO, PIMCO has continued to be the subadvisor to the Harbor Bond Fund. Mssrs. Kiesel, Mather, and Worah, the same PIMCO executives who are the portfolio managers of the Fund, took over as the portfolio managers to the Harbor Bond Fund. Harbor Bond Fund Supplement to Summary Prospectus dated March 1, 2014, at 1 (Sept. 29, 2014).

COMPLAINT
(CASE NO. 15-2037)
40

**RICHARDSON, PATRICK, WESTBROOK & BRICKMAN, LLC**
174 East Bay Street, P.O. Box 879
Charleston, SC 29401
TELEPHONE: (843) 727-6520
FACSIMILE: (843) 727-3103

**KELLER ROHRBACK L.L.P.**
1201 Third Avenue, Suite 3200
Seattle, Washington 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

1   99.     The PIMCO Total Return Fund has had the same portfolio manager (Gross) and

2   virtually identical performance to the Harbor Bond Fund. Yet, the PIMCO Total Return Fund

3   shareholders paid vastly more compensation for investment advisory services. PIMCO accepts

4   23 basis points for sub-advising the Harbor Bond Fund, while charging all Fund shareholders 25

5   basis points for the investment advising it provides the Fund. Moreover, Harbor Bond Fund

6   Institutional Class shareholders pay only 5<u>1</u> basis points for all services compared to 85 basis

7   points that Class A shareholders of the Total Return Fund pay, and that the 160 basis points

8   Class C shareholders pay to Defendants.

9   100.     In addition, a $1,000 investment is all that is required to purchase the Institutional

10   Class of the Harbor Bond Fund (which has significantly lower fees) but a $1 million minimum

11   investment is required to purchase the Institutional Class of the Total Return Fund. Moreover,

12   unlike the Class A shareholders of the Fund, the Harbor Bond Fund does not charge a load fee.

13   101.     As evidence of the excessive compensation received by PIMCO for the Total

14   Return Fund, <u>in fiscal year 2013,</u> PIMCO was willing to accept compensation of $17 million

15   annually for providing investment advisory services for a similar portfolio (the Harbor Bond

16   Fund) with similar investment returns, and the same investment managers (Bill Gross, and his

17   three successors once Gross left PIMCO) while charging its own Fund shareholders over $641

18   million for investment advisory services. <u>And in fiscal year 2014, PIMCO was willing to accept</u>

19   <u>$14 million annually for proving investment advisory services for the Harbor Bond Fund, while</u>

20   <u>charging its own investors over $460 million for investment advisory services to the Fund.</u>

21   102.     For this reason, analysts were recommending an investment in Harbor Bond Fund

22   rather than the Total Return Fund as early as July 2010:

23        [The Total Return Fund's fees are] on the high side for many retail investors.
          There are plenty of smaller, nimbler and cheaper alternatives. The Harbor Bond

24

**RICHARDSON, PATRICK, WESTBROOK & BRICKMAN, LLC**
174 East Bay Street, P.O. Box 879
Charleston, SC 29401
TELEPHONE: (843) 727-6520
FACSIMILE: (843) 727-3103

**KELLER ROHRBACK L.L.P.**
1201 Third Avenue, Suite 3200
Seattle, Washington 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

Fund —which is subadvised by PIMCO—is managed by Mr. Gross in the same fashion yet is cheaper and boasts one of the best records in the intermediate-term bond category, according to Morningstar.

Jane Kim, *Pimco: Too Big to Do Battle?* Wall St. J., July 31, 2010, http://www.wsj.com/articles /SB10001424052748704895004575395441645631572.

### 3.    Rates charged by PIMCO to the Total Return Active Exchange-Traded Fund

103.    In March 2012, Defendants started offering the PIMCO Total Return Active Exchange-Traded Fund which was designed to resemble the flagship Total Return Fund, such that it offers a "diversified portfolio of high quality bonds that is actively managed in an effort to maximize return in a risk-controlled framework." An ETF, or exchange-traded fund, trades throughout the trading day, and does not have any investment minimum or sales loads.

104.    The PIMCO Total Return Active ETF ("ETF") has a total expense ratio of 55 basis points compared to 85 basis points for Class A shares of the Fund and 160 basis points for Class C shares of the Fund.

105.    The ETF and the Fund resemble each other in two key respects: both funds were run by Gross, and they both had the same broad asset allocations. *See* Stan Luxenberg, *Pimco's Flagship Mutual Fund Trails the New ETF*, TheStreet (July 20, 2012), http://www.thestreet.com/ story/11629935/1/pimcos-flagship-mutual-fund-trails-the-new-etf.html.

106.    And as evidence of the excessive compensation received by PIMCO for the Total Return Fund, PIMCO was willing to accept compensation of $20 million (for fiscal year ending June 30, 2014) annually for managing and advising a similar portfolio (the Total Return Active ETF) with similar investment returns, and the same investment managers (Bill Gross and his three successors) while charging its own Fund shareholders over $1.2 **billion** for investment advisory and administrative and supervisory services. Similarly, PIMCO was willing to accept $15.3 million (for fiscal year ending June 30, 2015) annually for managing and advising the

**RICHARDSON, PATRICK, WESTBROOK & BRICKMAN, LLC**
174 East Bay Street, P.O. Box 879
Charleston, SC 29401
TELEPHONE: (843) 727-6520
FACSIMILE: (843) 727-3103

**KELLER ROHRBACK L.L.P.**
1201 Third Avenue, Suite 3200
Seattle, Washington 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

1    Total Return Active ETF (with the same investment managers as those managing the Fund),

2    while charging its own Fund shareholders over $910 million for investment advisory and

3    supervisory and administrative services.

4         107.    These three fee comparators (PIMCO's private clients, the sub-advised Harbor

5    Bond Fund, and the PIMCO Total Return Active ETF) establish that the Defendants are charging

6    advisory, supervisory and administrative, distribution, and servicing fees to the Fund that are

7    excessive and disproportionate to the value of the services rendered and not within the range of

8    fees that might result from arm's-length bargaining. This violates Section 36(b) of the ICA.

9    **D.    The Nature And Quality Of The Services Provided To The Fund's Shareholders**

10        108.    The nature of the advisory and distribution services provided to the Fund is

11   straightforward: Defendants select (buy, sell or hold), at their discretion, short-term instruments,

12   corporate bonds and notes, U.S. Treasury obligations, U.S. Government agencies, sovereign

13   issues, mortgage-backed securities, and other investments for the Fund and attempt to garner

14   new shareholders of the Fund. This is precisely the same set of services provided to Defendants'

15   other clients even though the Fund is charged dramatically higher fees. *See supra* § V.C.

16        109.    As set forth above, the nature of the advisory services provided to the Fund has

17   been very poor recently. In 2012, the Fund failed to outperform its benchmark, and 60% of the

18   Fund's peers outperformed the Fund. In Calendar Year 2013, the Fund performed terribly. For

19   example, shareholders in Class A of the Fund saw returns of -5.97% before taxes, while

20   shareholders of Class B shares saw returns of -6.36% before taxes. *See supra* ¶ 36. And in

21   Calendar Year 2014, performance still lagged well below PIMCO's own benchmarks. Class A

22   shareholders saw a meager 1.60% pre-tax return and Class C shareholders only 3.80% pre-tax

23   return while the benchmark Barclays GNMA Index and Lipper GNMA Funds Average posted

24   returns of 5.97% and 5.05%, respectively, over the same period.

COMPLAINT
(CASE NO. 15-2037)
43

**RICHARDSON, PATRICK, WESTBROOK
& BRICKMAN, LLC**
174 East Bay Street, P.O. Box 879
Charleston, SC 29401
TELEPHONE: (843) 727-6520
FACSIMILE: (843) 727-3103

**KELLER ROHRBACK L.L.P.**
1201 Third Avenue, Suite 3200
Seattle, Washington 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

110.    Nevertheless, Plaintiff and other shareholders of the Fund pay Defendants higher percentage fees and dramatically higher absolute dollar fees because the Board has failed to negotiate any reduction in the fees. The fees paid by the Fund are not even close to the range of fees produced by the arm's-length negotiations with the Defendants' other clients.

111.    Moreover, the nature of the administrative and distribution services provided to the Fund does not justify the higher fees; it is the size of the fund, not its specialized nature, that determines a fair fee:

> We disagree with the premise that specialized fund strategies should result in higher expense ratios. Though we will make accommodations to reflect the higher costs inherent in running a smaller fund, we don't think funds of the same size ought to be charging materially different expenses.

Kunal Kapoor, *A High Hurdle: Our Criteria for Picking Funds*, Morningstar (Dec. 4, 2003).

112.    No accommodations need be made for the Defendants based on the "higher costs inherent in running a smaller fund," since the Fund was until recently the largest in the world. *See id.* The reverse is true: accommodations for the benefit of the shareholders must be made to reflect the far lower costs in running a larger fund. No such accommodations were made by the Defendants. Moreover, the cost of servicing the accounts of larger private clients is often far more expensive than servicing smaller investor's accounts—investors who command far less time of the investment advisor and its affiliates.

113.    Further, any ancillary "customer service" services Defendants purport to be providing to the Fund under the guise of the "supervisory and administrative," or "distribution and servicing" fees is illusory.

114.    While the compensation Defendants receive pursuant to its contracts with the Fund is extraordinary, the services they provide to Fund shareholders, such as Plaintiff, are poor. In his dealings with Defendants, Plaintiff has routinely encountered unacceptable service and

COMPLAINT
(CASE NO. 15-2037)
44

**RICHARDSON, PATRICK, WESTBROOK & BRICKMAN, LLC**
174 East Bay Street, P.O. Box 879
Charleston, SC 29401
TELEPHONE: (843) 727-6520
FACSIMILE: (843) 727-3103

**KELLER ROHRBACK L.L.P.**
1201 Third Avenue, Suite 3200
Seattle, Washington 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

inadequate access to information about his account. Examples of the problems Plaintiff has encountered include:

A.  PIMCO reported to Plaintiff a personal rate of return for Plaintiff's investment in the Fund, which varied from the return rates of other family accounts in the Fund, and from the published return rates for the Fund. Given the lack of clarity as to the rates of return, Plaintiff called PIMCO for an explanation, but PIMCO could not satisfactorily explain the differences.

B.  PIMCO failed to synchronize account value information and daily net asset value for the Fund on PIMCO's website. This absence of an effective date for account balances created confusion regarding for what day the account value was being reported, i.e., whether for the prior trade day or the current trade day. Plaintiff called PIMCO and was told that PIMCO could not add an "effective date" to the reported account balances on the PIMCO website. Plaintiff suggested that, during the upcoming redesign of the website, PIMCO should report the "effective date" of account balances and was told it could not be done.

C.  Plaintiff was unable to access his account due to server problems at PIMCO at least 8 separate times in 2014. Plaintiff has also frequently encountered webpages that cannot be accessed due to errors within PIMCO's control. Error messages have often not been germane or have been unclear, regarding the nature of the website problem.

D.  Plaintiff has been unable to consistently access full account history online for all accounts. Moreover, how far back in time Plaintiff could access his transaction history has varied from account to account, even though the date all accounts were

RICHARDSON, PATRICK, WESTBROOK
& BRICKMAN, LLC
174 East Bay Street, P.O. Box 879
Charleston, SC 29401
TELEPHONE: (843) 727-6520
FACSIMILE: (843) 727-3103

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, Washington 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

opened is the same across all accounts. In the latter case, PIMCO indicated that this variability resulted from the retroactive correction of their prior errors, i.e., the assignment of current-year "confirm dates," when PIMCO retroactively corrected previous-year(s) trades.

E.     PIMCO has routinely failed to process Plaintiff's transaction requests in a timely manner, in the manner Plaintiff has requested, and in a manner that PIMCO assured Plaintiff they would be handled, and has, at times, assigned incorrect trade dates.

F.     PIMCO has routinely failed to process required minimum distributions in a timely manner, despite Plaintiff's timely requests, repeated follow-up conversations, and assurances from PIMCO employees.

G.     Despite Plaintiff's specific instructions, PIMCO has issued and mailed, or planned to issue and mail, dividend distributions or required minimum distributions via checks, despite Plaintiff's specific, even written, instructions and PIMCO's agreement to send distributions via electronic, ACH, bank transfers.

H.     PIMCO has also routinely failed to process tax-year recharacterizations of Roth IRA conversions in a timely manner and to communicate recharacterization deadlines properly. PIMCO entered incorrect trade dates for a number of recharacterizations in 2011, 2012, and 2013. Moreover, PIMCO in a number of instances failed to provide correct tax forms and tax reporting information, or to correctly indicate the calendar tax year to which a transaction would apply and within which it would be reported.

I.     PIMCO's failure to process transactions according to Plaintiff's requests has caused Plaintiff to spend innumerable hours trying to correct PIMCO's errors, despite

**RICHARDSON, PATRICK, WESTBROOK & BRICKMAN, LLC**
174 East Bay Street, P.O. Box 879
Charleston, SC 29401
TELEPHONE: (843) 727-6520
FACSIMILE: (843) 727-3103

**KELLER ROHRBACK L.L.P.**
1201 Third Avenue, Suite 3200
Seattle, Washington 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

assurances from PIMCO employees that corrections would be timely and accurately made. In 2013 alone, Plaintiff contacted PIMCO approximately 16 times to correct trade dates of transactions and recharacterizations. And in 2012, when Plaintiff contacted PIMCO to correct certain transaction dates and amounts, a PIMCO representative in its adjustment team admitted PIMCO has not properly managed transactions and earnings. The representative told Plaintiff "I don't blame you for not trusting that PIMCO is handling any transactions, including earnings, correctly."

J.      PIMCO did not provide Plaintiff and other Fund shareholders with timely information about Bill Gross's sudden and unexpected departure from PIMCO and who would thereafter be managing the Fund. Although Bill Gross was widely reported to have left PIMCO on September 26, 2014, Plaintiff received no mailed notice or explanation from PIMCO. Plaintiff only received PIMCO's notice of this information when logging into his PIMCO account on October 13, 2014, and reading a separate PIMCO webpage containing a supplemental notice to shareholders about Bill Gross's departure and who would be managing the Fund.

K.      Plaintiff continued having issues with the servicing of his PIMCO account by PIMCO customer service representatives as well as recurring problems with PIMCO's website throughout 2015.

## E.      The Profitability Of The Fund

115.     The profitability to the Defendants of managing the Fund is a factor that must also be considered when evaluating whether the compensation received by Defendants is excessive.

116.     Intuitively, it is obvious that the fees charged to other clients in arm's length negotiations represent profitable transactions, *see, e.g., supra* at § V.C (observing that Defendants charge far less to clients other than the Fund for the same services). Otherwise,

**RICHARDSON, PATRICK, WESTBROOK & BRICKMAN, LLC**
174 East Bay Street, P.O. Box 879
Charleston, SC 29401
TELEPHONE: (843) 727-6520
FACSIMILE: (843) 727-3103

**KELLER ROHRBACK L.L.P.**
1201 Third Avenue, Suite 3200
Seattle, Washington 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

1    investment managers (such as the Defendants) intending to stay in business would be required to

2    charge a higher fee. Accordingly, it is obvious that the management of the Fund (paying much

3    higher advisory, supervisory and administrative, distribution and servicing fees than other

4    clients) is highly profitable to the Defendants.

5        117.    Public filings further indicate that the Board is aware that the profitability of the

6    Fund is outsize when compared to other (captive) mutual funds in the industry. Both the

7    September 30, 2014 and September 30, 2015, Semiannual Reports for the PIMCO Total Return

8    Fund stated that "profit margins were within the ranges, *although above the median*, of publicly

9    held investment management companies reported by Lipper and Strategic Insight (an

10   independent provider of fund industry research)" (emphasis added).

11       118.    "Profitability" is a function of revenues minus the costs of providing services.

12   Although simple in definition, it is very problematic in practice in the mutual fund industry

13   because of questionable cost accounting practices.

14       119.    Here, the PIMCO Defendants are subsidiaries of a foreign public company,

15   Allianz, and precise information regarding the actual or claimed profitability of the Fund to

16   Defendants is not available except through discovery, even if it were maintained in an accurate

17   and useable format. *See Krantz v. Fidelity Mgmt. & Research Co.*, 98 F. Supp. 2d 150, 159 (D.

18   Mass. 2000).

19       120.    One thing that is clear, however, is that where profitability is concerned, size

20   matters. There are higher cost ratios inherent in running a smaller fund and, conversely, lower

21   cost ratios in running a larger fund. The Total Return Fund was until recently the largest mutual

22   fund in the world and, accordingly, should be one of the least expensive in the world to advise on

23   the basis of costs divided by assets. This is not the case. The Fund's fees have grown at the same

24

**RICHARDSON, PATRICK, WESTBROOK
& BRICKMAN, LLC**
174 East Bay Street, P.O. Box 879
Charleston, SC 29401
TELEPHONE: (843) 727-6520
FACSIMILE: (843) 727-3103

1   rate as the underlying assets in the Fund have grown and Defendants have not meaningfully

2   lowered any fees they charge the Fund in the last 10 years.

3       121.    Even without complete data, it is clear that one of the world's largest mutual

4   funds is astoundingly profitable. The Total Return Fund alone poured over $1.5 billion into

5   Defendants' coffers through a variety of fees in just a single year—the fiscal year ending March

6   31, 2014. Of that, as much as $640 million was for pure advisory services. Similarly, for fiscal

7   year 2014 (ending March 31, 2015), the Fund provided over $1.1 billion to Defendants, of which

8   over $460 million was for pure advisory services. In contrast, in fiscal year 2003, the same

9   advisory services were "only" $185 million when the Fund was roughly half the size it was in

10  fiscal year 2013 and far closer to the size to the Fund for fiscal year 2014. The payment and

11  receipt of such a dramatic increase in fees for pure advisory services while managing comparable

12  (and at the time either comparable or smaller in size) portfolios for a much smaller fee is a

13  breach of Defendants' fiduciary duty to the Fund and its shareholders, including Plaintiff.

14      122.    Similarly, for fiscal year 2013, the Fund paid $608 million in "supervisory and

15  administrative fees," while the Fund paid "only" $165.8 million for the same services in fiscal

16  year 2003. For fiscal year 2014, the Fund paid $442 million in "supervisory and administrative

17  fees" relative to the $165.8 million for the same services in 2003. This is despite the fact that the

18  Fund's AUM for fiscal year 2014 is almost the same as it was in fiscal year 2003. Upon

19  information and belief, the true cost of these "supervisory and administrative" services have not

20  tripled in 10 years. The payment and receipt of such a dramatic increase in fees for these services

21  while not actually incurring costs that come anywhere close to the three-fold increase in fees

22  charged is a breach of Defendants' fiduciary duty to the Fund and its shareholders, including

23  Plaintiff.

24

COMPLAINT
(CASE NO. 15-2037)
49

**RICHARDSON, PATRICK, WESTBROOK
& BRICKMAN, LLC**
174 East Bay Street, P.O. Box 879
Charleston, SC 29401
TELEPHONE: (843) 727-6520
FACSIMILE: (843) 727-3103

**KELLER ROHRBACK L.L.P.**
1201 Third Avenue, Suite 3200
Seattle, Washington 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

1

**F.      Fallout Benefits (Indirect Profits) To Defendants Attributable To The Fund**

2        123.    Fallout benefits include the attraction of new customers *for other funds or*

3    *products offered by the Defendants*, cross-selling Defendants' other funds and services to current

4    shareholders of the Fund, and other benefits associated generally with the development of

5    goodwill and the creation and growth of a client base for the Defendants.

6        124.    For example, in addition to offering over 150 mutual funds, PIMCO states on its

7    website that it "provides investment solutions in a variety of vehicles for individual investors and

8    the financial intermediaries they work with," and then recommends that individual investors

9    check out their mutual fund and ETF websites for more information, and suggests that high-net-

10   worth investors seek out their "PIMCO separate accounts."

11       125.    PIMCO also stated in its September 30, 2014, Semiannual Report for the PIMCO

12   Total Return Fund that "other benefits" received by PIMCO and its affiliates as a result of

13   PIMCO's relationship with the Trust include "possible ancillary benefits to PIMCO's

14   institutional investment business." <u>PIMCO repeated these same statements in its September 30,</u>

15   <u>2015 Semiannual Report for the PIMCO Total Return Fund.</u>

16       126.    Brokerage commissions payable by the Fund to the Defendants (or their affiliates)

17   constitute another fallout benefit. These commissions are paid, as securities are bought and sold

18   at the Defendants' direction for the Fund. PIMCO states on its website that it has introduced "a

19   fully integrated investment solutions and distribution platform in the US in order to enhance our

20   partnership with financial advisors." PIMCO,

21   http://www.pimco.com/EN/OurFirm/Pages/PIMCOTimeline.aspx (last visited Dec. 31, 2014)

22   (originally cited source no longer available, print copy retained by counsel).

23

24

**RICHARDSON, PATRICK, WESTBROOK**
**& BRICKMAN, LLC**
174 East Bay Street, P.O. Box 879
Charleston, SC 29401
TELEPHONE: (843) 727-6520
FACSIMILE: (843) 727-3103

**KELLER ROHRBACK L.L.P.**
1201 Third Avenue, Suite 3200
Seattle, Washington 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

127.    The Defendants indirectly profit because of "fallout benefits" attributable to the Fund. Fallout benefits are often not quantified by the Defendants or shared with the Board even though the Board cannot determine the fairness of any fee without having this information.

128.    Fallout benefits are required to be disclosed to the Fund's Board of Trustees as part of the total mix of information necessary to determine the reasonableness of the fees. Even without considering the fallout benefits, the fees are excessive in both the rate and total compensation the fees generate. After considering the fallout benefits, the advisory, supervisory and administrative, distribution and servicing fees are huge and their payment and receipt violates Section 36(b) of the ICA.

G.    **The Independence And Conscientiousness Of The Trustees**

1.    **Role of Independent Trustees Under Legal and Regulatory Framework**

129.    As required by the ICA, all of the fees paid to Defendants must be approved by the Fund's Board on an annual basis.

130.    As a fiduciary, the Board is charged with ensuring that all of the fees paid are reasonable and in the best interest of the Fund. Under the ICA, the majority of the trustees are to be "disinterested" requiring that they oversee the fees charged with an eye solely to the benefit of the Fund and its shareholders. Respected industry expert, Morningstar, recommends that a board be comprised of at least 75% disinterested trustees. 2014 Morningstar Stewardship Report at 5.

131.    The disinterested directors (or trustees) are supposed to serve as "watchdogs" for the shareholders of the Fund. As such, the disinterested directors have primary responsibility for, among many other things, negotiating and approving all agreements with Defendants and reviewing the reasonableness of the fees received by Defendants. Accordingly, as noted by the GAO, the directors are expected to review, among other things, the adviser's costs, whether fees have been reduced when the Fund's assets have grown, and the fees charged for similar services.

**RICHARDSON, PATRICK, WESTBROOK & BRICKMAN, LLC**
174 East Bay Street, P.O. Box 879
Charleston, SC 29401
TELEPHONE: (843) 727-6520
FACSIMILE: (843) 727-3103

**KELLER ROHRBACK L.L.P.**
1201 Third Avenue, Suite 3200
Seattle, Washington 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

*See* GAO Report at 14. These responsibilities necessarily require the directors to rely on information provided by Defendants. Defendants, in turn, have a fiduciary duty to provide all information reasonably necessary for the directors to perform their obligations.

132.     As the GAO Report noted, the "external management" structure of most mutual funds (including the Fund) creates a potential conflict of interest between a fund's shareholders and its adviser. The United States Supreme Court has characterized the disinterested director requirement as "the cornerstone of the ICA's efforts to control" this conflict of interest. *Burks v. Lasker*, 441 U.S. 471 (1979).

133.     The SEC has specifically recognized however, that even disinterested directors may not be independent but, rather, subject to domination or undue influence by a fund's investment adviser. For example, in the related context of distribution fees, "disinterested directors should not be entrusted with a decision on use of fund assets for distribution without receiving the benefit of measures designed to enhance their ability to act independently." Bearing of Distribution Expenses by Mutual Fund, Investment Co. Act Rel. No. 11414, 1980 WL 20761, at *11 (Oct. 28, 1980).

134.     Despite the structural protections of independent directors envisioned by the Investment Company Act, the Fund's trustees have been subverted by Defendants and no longer serve in their "watchdog" role. This subversion was (and remains) a breach by the Defendants of the fiduciary duties owed to the Fund.

### 2.      The Compensation Structure for the PIMCO Board Leads to Lack of Independence

135.     Until the Spring 2014, the Board had only seven trustees total (two interested trustees and five "independent" trustees). Subsequently, the Board had only five trustees (two interested and three "independent" trustees) after one trustee resigned and the other was

1  removed. <u>This lasted until April 2015, when the Board added 4 new "independent" trustees for a</u>

2  <u>total of 6 "independent" and two interested trustees. Despite adding four new trustees, the Board</u>

3  <u>still does not have a lead Independent Trustee.</u> The Board meets periodically throughout the year

4  to oversee all funds in the Fund Complex.

5       136.    During the fiscal year ending March 31, 2014, the members of the Board

6  simultaneously oversaw between 167 to 175 portfolios/funds that make up the Fund Complex.

7  <u>For the fiscal year ending March 31, 2015, the members of the Board simultaneously oversaw</u>

8  <u>between 152 to 177 portfolios/funds that make up the Fund Complex.</u>

9       137.    The trustees are compensated handsomely for their services with a fee based on a

10  schedule that takes into account an annual retainer, special retainers for committee chair

11  positions, the number of meetings attended, and expenses incurred. Each of the independent

12  trustees is paid an annual retainer of $145,000, a $15,000 retainer to the Audit Committee

13  chairman and a $2,250 retainer to <u>all other committee</u> chairmen. <u>Additionally, the co-leads of the</u>

14  <u>Valuation Oversight Committee together receive $8,500 annually ($4,250 each).</u> The trustees are

15  also paid $15,000 for each Board meeting they attend in person, $750 for each committee

16  meeting attended ($2,000 to the Audit Committee chair), $1,500 for each Board meeting

17  attended telephonically, <u>and $750 for each Valuation Oversight Committee meeting attended,</u>

18  plus reimbursement of related expenses.

19       138.    For the fiscal years ending March 31, 2014 <u>and March 31, 2015</u>, the independent

20  trustees for the funds in the Fund Complex received total compensation in the following

21  amounts:

22

23

24

RICHARDSON, PATRICK, WESTBROOK
& BRICKMAN, LLC
174 East Bay Street, P.O. Box 879
Charleston, SC 29401
TELEPHONE: (843) 727-6520
FACSIMILE: (843) 727-3103

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, Washington 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

| Trustee | The PIMCO Trust | | Fund Complex | |
|---|---|---|---|---|
| | 2013 | 2014[2] | 2013 | 2014 |
| George Borst[3] | N/A | $16,860 | N/A | $25,000 |
| E. Philip Cannon | $209,500 | $217,750 | $417,050 | $440,550 |
| Jennifer Holden Dunbar[3] | N/A | $16,860 | N/A | $25,000 |
| J. Michael Hagan[1] | $203,250 | $219,250 | $306,050 | $338,800 |
| Gary F. Kennedy[3] | N/A | $16,860 | N/A | $25,000 |
| Peter B. McCarthy[3] | N/A | $16,860 | N/A | $140,475 |
| Ronald C. Parker | $224,500 | $239,000 | $339,800 | $367,300 |
| Vern O. Curtis[1] | $209,500 | N/A | $341,675 | N/A |
| William J. Popejoy[1] | $211,750 | N/A | $322,300 | N/A |

[1] No longer on Board. *See* 2013 SAI at 71, August 14, 2015 SAI Supplement.
[2] Amounts represent the aggregate compensation before deferral with respect to the Trust's Fiscal Year ended March 31, 2015. *See* 2013 SAI at 71, 2014 SAI at 77.
[3] Joined Board effective April 20, 2015. *See* 2014 SAI at 77.

139.    On information and belief because the precise number of Board meetings are not directly published, for fiscal year 2013, Trustee Parker attended three full Board meetings in person and four telephonically, Trustee Hagan attended three full Board meetings in person and four telephonically, and Trustee Cannon attended four full Board meetings in person. For their services in fiscal year 2013, Trustee Cannon earned $209,500 from the Trust, Trustee Hagan earned $203,250 from the Trust, and Trustee Parker earned $224,500 from the Trust. These same trustees provided services to other PIMCO-related trusts, which bumped the total compensation for Trustee Cannon to $417,050, for Trustee Hagan to $306,050, and for Trustee Parker $339,800. The two out-going disinterested trustees also earned substantial sums: Mr. Popejoy was paid $211,750 in aggregate compensation from the Trust and Mr. Curtis earned $209,500 in

COMPLAINT
(CASE NO. 15-2037)
54

**RICHARDSON, PATRICK, WESTBROOK & BRICKMAN, LLC**
174 East Bay Street, P.O. Box 879
Charleston, SC 29401
TELEPHONE: (843) 727-6520
FACSIMILE: (843) 727-3103

**KELLER ROHRBACK L.L.P.**
1201 Third Avenue, Suite 3200
Seattle, Washington 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

aggregate compensation from the Trust. <u>The returning Trustees continued to earn hundreds of thousands of dollars in aggregate compensation in fiscal year 2014, and the four new trustees earned significant compensation as well even though they only commenced work on April 20, 2015 and did not serve on the Board for the complete fiscal year 2014.</u>

<u>140a.   For fiscal year 2014, there were 6 Audit Committee meetings, 12 Valuation Committee meetings, and 7 Governance Committee meetings. The precise number of Board meetings has not been published. Therefore, Plaintiff presently lacks sufficient public information to determine the attendance records of the Board and Committee meetings for fiscal year 2014.</u>

140.     As a result, board membership in the Fund Complex is a lucrative part-time job, the continuation of which is dependent (at least in part) on the continued good will and support of Defendants, as demonstrated by the ouster of Trustee Popejoy after he criticized Gross. *See infra* ¶ 144. Thus, the compensation structure for the Board threatens the independence of the trustees.

### 3.     The Composition of the PIMCO Board Leads to Lack of Independence and Conscientiousness

#### a.     PIMCO Board Lacks a Sufficient Number of Independent Trustees

141.     The Board's ability to oversee and review the amount of compensation being paid by the Fund is deficient in light of the very few disinterested trustees on the Board. Morningstar has "faulted the board for having just five independent trustees among the total of seven—less than the three-quarters majority it said was a best practice for mutual fund boards." E. Scott Reckard, *Morningstar Cuts PIMCO Fund Rating from Gold to Bronze After Gross Exit*, L.A. Times, Sept. 30, 2014, http://www.latimes.com/business/la-fi-morningstar-downgrades-pimco-20140930-story.html. <u>It was not until April 20, 2015, that a sufficient number of independent</u>

**RICHARDSON, PATRICK, WESTBROOK & BRICKMAN, LLC**
174 East Bay Street, P.O. Box 879
Charleston, SC 29401
TELEPHONE: (843) 727-6520
FACSIMILE: (843) 727-3103

**KELLER ROHRBACK L.L.P.**
1201 Third Avenue, Suite 3200
Seattle, Washington 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

trustees were elected to the Fund's Board to bring the board composition in line with industry best practices. *See* 2015 SAI at 76; 2015 Morningstar Stewardship Report at 5.

142.    As of March 20, 2014, Morningstar rated PIMCO a "C" for Board Quality. 2014 Morningstar U.S. Mutual Fund Industry Stewardship Survey, Morningstar, 39 (Mar. 20, 2014), http://corporate.morningstar.com/us/documents/MethodologyDocuments/ResearchPapers/Mutual FundIndustryStewardship.pdf. However after two of the five independent trustees abruptly resigned, Morningstar further downgraded the Fund to a "D," for "Fund Board Quality" meaning that the Board was "trailing the industry norms." Morningstar captured the problems with the Board succinctly:

> When there is turmoil at a fund company, it is especially important to have an effective board in place. Yet the PIMCO boards themselves are in some turmoil. Continued disruption among PIMCO's independent trustees raises significant concern about the board's independence as well as its long-established setup. More specifically, two of the PIMCO Funds Trust's five independent trustees, William Popejoy and Vern Curtis, recently left the board (as well as the Variable Insurance Trusts and ETF Trust), *leaving its composition at just three independent trustees and two interested trustees and at just 60% independent*. This level falls short of industry norms; most fund boards are at least 75% independent (emphasis added).

2014 Morningstar Stewardship Report at 5; 2015 Morningstar Stewardship Report at 6 (again issuing a grade of "D" to PIMCO for "Fund Board Quality").

143.    Of the two independent trustees who left the Board, it appears that 23-year Board veteran, William Popejoy, was forced to resign after butting heads with Bill Gross. "Southern California businessman William J. Popejoy, had departed the board under unexplained circumstances earlier this year after criticizing Gross's $200 million salary and 'bullying' management style in an interview with [L.A.] The Times." E. Scott Reckard, *Morningstar Cuts PIMCO Fund Rating From Gold to Bronze After Gross Exit*, L.A. Times, Sept. 30, 2014, http://www.latimes.com/business/la-fi-morningstar-downgrades-pimco-20140930-story.html.

RICHARDSON, PATRICK, WESTBROOK
& BRICKMAN, LLC
174 East Bay Street, P.O. Box 879
Charleston, SC 29401
TELEPHONE: (843) 727-6520
FACSIMILE: (843) 727-3103

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, Washington 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

"According to a midsummer regulatory filing by the funds, Popejoy resigned as one of the funds' seven trustees. But a later revision of the filing deleted the 'resigned' language, showing only that Popejoy no longer was a trustee." E. Scott Reckard, *Longtime trustee of Pimco mutual funds appears to have lost his job*, L.A. Times, Sept. 2, 2014, http://www.latimes.com/business/la-fi-popejoy-pimco-20140903-story.html; *compare* 2013 SAI at 71 (July 31, 2014) *with* 2013 SAI at 71 (July 31, 2014 as supplemented Aug. 25, 2014). "Popejoy later told The Times that he had disagreed with the chairman of the board, PIMCO executive Brent Harris, over the makeup of the board, with Popejoy saying it should have women and minorities instead of just white men." E. Scott Reckard, *Morningstar Cuts PIMCO Fund Rating From Gold to Bronze After Gross Exit*, L.A. Times, Sept. 30, 2014, http://www.latimes.com/business/la-fi-morningstar-downgrades-pimco-20140930-story.html. He also called for PIMCO's parent, Allianz SE, to investigate Gross's compensation and management ability and publicly criticized Gross's compensation as "not appropriate." *Id.*

144.    From the time of both Curtis's and Popejoy's departures until April 20, 2015, the Board had a mere 2 independent trustees. This left the Board without sufficient independence to ensure the fee agreements with Defendants are negotiated in the best interest of the Fund and its shareholders. Similarly, even after the April 2015 appointment of 4 new independent trustees, the Board lacks a lead independent trustee and is instead chaired by an interested trustee, Brent Harris.

### b.    Interested Trustees Control the PIMCO Board

145.    Even if statutorily disinterested, the trustees are in all practical respects dominated and unduly influenced by Defendants in reviewing the fees paid by Plaintiff and other shareholders of the Fund.

COMPLAINT
(CASE NO. 15-2037)
57

**RICHARDSON, PATRICK, WESTBROOK & BRICKMAN, LLC**
174 East Bay Street, P.O. Box 879
Charleston, SC 29401
TELEPHONE: (843) 727-6520
FACSIMILE: (843) 727-3103

**KELLER ROHRBACK L.L.P.**
1201 Third Avenue, Suite 3200
Seattle, Washington 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

146.     First, Morningstar has criticized the Board overseeing the bond funds for having PIMCO Executive Brent Harris head the Board rather than an independent trustee. E. Scott Reckard, *Morningstar Cuts PIMCO Fund Rating From Gold to Bronze After Gross Exit*, L.A. Times, Sept. 30, 2014, http://www.latimes.com/business/la-fi-morningstar-downgrades-pimco-20140930-story.html. This continues to be true even after the appointment of 4 new independent trustees.

147.     Second, the lack of independence was aired publicly in the firing of Mr. Popejoy after he had criticized PIMCO's CEO and CIO, Gross, and the compensation he earned from the Fund and Fund Complex. This is further evidenced by the exceptional fact that two long-time trustees left in 2014. Rarely do trustees to mutual funds abandon such lucrative part-time work, and in the case of Mr. Popejoy it is clear he did not resign.

148.     Third, by industry standards, the Board has been woefully understaffed with independent trustees. *See* Morningstar Stewardship Report, at 5. The Board lacks a sufficient number of independent trustees to conscientiously manage all of the funds in the Fund Complex that the Board oversees.

149.     Each trustee now oversees between 152 and 177 different funds in the Fund Complex. *See* 2014 SAI 68-69.

150.     And yet, the Board meets only periodically throughout the year to measure the proper fee rate for hundreds of different fees the funds in the Fund Complex are charged.

### 4.     The Information Defendants Provide to the PIMCO Board is Inadequate

151.     Defendants have also failed to satisfy their fiduciary duty under the Investment Company Act to provide the Fund's trustees with all information reasonably necessary for them to do their jobs, including determining the fairness of the fees. As Morningstar reported, "[t]he opacity of these data, combined with its girth, suggests that the board has not done all that it can

COMPLAINT
(CASE NO. 15-2037)
58

**RICHARDSON, PATRICK, WESTBROOK & BRICKMAN, LLC**
174 East Bay Street, P.O. Box 879
Charleston, SC 29401
TELEPHONE: (843) 727-6520
FACSIMILE: (843) 727-3103

**KELLER ROHRBACK L.L.P.**
1201 Third Avenue, Suite 3200
Seattle, Washington 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

1    to aggressively negotiate for better economies of scale or to at least help investors better

2    understand why the fees they pay are appropriate." 2014 Morningstar Stewardship Report at 5.

3    More recently, Morningstar stated that "[a]nother elusive issue that falls under the boards'

4    domain is the way in which PIMCO accounts for and reports the expenses of its funds" and again

5    questioned PIMCO's "transparency in its accounting of some of the services provided to the

6    funds." 2015 Morningstar Stewardship Report at 6.

7        152.    The Board has also failed to provide adequate transparency to shareholders, such

8    as describing what kinds of expenses are included in the "supervisory and administrative fees."

9    *See* 2014 Morningstar Stewardship Report at 5. Allegations in the lawsuit recently filed by Bill

10   Gross against PIMCO echo this concern. *See* Gross Complaint at ¶¶ 53, 54 (alleging that PIMCO

11   executives were focused on raising fees paid by fund investors to generate profits for PIMCO

12   and that these efforts were accomplished by raising annual fees, including for the Fund, by

13   labeling such fees as "administrative costs").

14       153.    Despite a wealth of public information regarding the excessiveness of the fees

15   charged to the Fund, *see supra* §§ V.A-G, the trustees never negotiated to add breakpoints to

16   share the benefits of economies of scale experienced by the Defendants, even as the Fund grew

17   to be the largest fund in the world.

18       154.    The trustees' lack of independence and conscientiousness establishes Defendants'

19   violation of Section 36 of the ICA, regardless of whether the trustees are presumed

20   "independent" by Section 10 of the ICA.

21

22

23

24

RICHARDSON, PATRICK, WESTBROOK
& BRICKMAN, LLC
174 East Bay Street, P.O. Box 879
Charleston, SC 29401
TELEPHONE: (843) 727-6520
FACSIMILE: (843) 727-3103

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, Washington 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

# VI.   CLAIM I

## ICA § 36(B) BREACH OF FIDUCIARY DUTY
### (EXCESSIVE INVESTMENT ADVISORY AND SUPERVISORY/ADMINISTRATIVE FEES)

155.   Plaintiff repeats and realleges paragraphs 1 through 155, inclusive, of this complaint.

156.   This claim is alleged against Defendant Pacific Investment Management Company LLC.

157.   The investment advisory fees charged by the Defendant PIMCO are and continue to be so disproportionately large that they bear no reasonable relationship to the services rendered and are not within the range of the compensation that would have been negotiated at arm's length in light of all the surrounding circumstances (or the range of what has been negotiated at arm's length). Instead, they are dramatically higher than those negotiated or that would be negotiated in any arm's-length negotiation.

158.   Defendant PIMCO has received and continues to receive excessive investment advisory fees attributable to the extraordinary economies of scale generated through Defendant PIMCO's provision of investment advisory services to the Fund that have not been shared with the Plaintiff and the Fund.

159.   The supervisory and administrative fees charged by Defendant PIMCO are and continue to be so disproportionately large that they bear no reasonable relationship to the services rendered and are not within the range of the compensation that would have been negotiated at arm's length in light of all the surrounding circumstances (or the range of what has been negotiated at arm's length). Instead, they are dramatically higher than those negotiated or that would be negotiated in any arm's-length negotiation.

COMPLAINT
(CASE NO. 15-2037)
60

**RICHARDSON, PATRICK, WESTBROOK
& BRICKMAN, LLC**
174 East Bay Street, P.O. Box 879
Charleston, SC 29401
TELEPHONE: (843) 727-6520
FACSIMILE: (843) 727-3103

**KELLER ROHRBACK L.L.P.**
1201 Third Avenue, Suite 3200
Seattle, Washington 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

160.     Defendant PIMCO has received and continues to receive excessive supervisory and administrative fees attributable to the extraordinary economies of scale generated through Defendant PIMCO's provision of supervisory and administration services to the Fund that have not been shared with the Plaintiff and the Fund.

161.     The supervisory and administrative fees charged by Defendant PIMCO to the Fund are and have been grossly excessive in light of the true cost of providing those services to the Fund.

162.     In charging and receiving excessive investment advisory fees as well as supervisory and administrative fees and failing to put the interests of the Fund, the Plaintiff, and the Fund's other shareholders ahead of its own interests, Defendant PIMCO breached its statutory fiduciary duties to the Fund and the Plaintiff.

163.     Defendant PIMCO has breached and continues to breach those statutory ICA Section 36(b) fiduciary duties to the Fund by accepting excessive and inappropriate compensation. Plaintiff seeks, pursuant to Section 36(b)(3) of the ICA, the "actual damages resulting from the breach of fiduciary duty" by Defendant PIMCO, up to and including, "the amount of compensation or payments received from" the Fund, or pursuant to 15 U.S.C. §80-46(b) ("§47(b) of the ICA"), rescission of the contracts.

## VII.    CLAIM II

### ICA § 36(B) BREACH OF FIDUCIARY DUTY
### (EXCESSIVE RULE 12b-1 DISTRIBUTION FEES AND EXTRACTION OF ADDITIONAL COMPENSATION FOR ADVISORY SERVICES)

164.     Plaintiff repeats and realleges paragraphs 1 through 164, inclusive, of this complaint.

165.     This claim is alleged against Defendant PIMCO Investments LLC.

**RICHARDSON, PATRICK, WESTBROOK & BRICKMAN, LLC**
174 East Bay Street, P.O. Box 879
Charleston, SC 29401
TELEPHONE: (843) 727-6520
FACSIMILE: (843) 727-3103

**KELLER ROHRBACK L.L.P.**
1201 Third Avenue, Suite 3200
Seattle, Washington 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

166. The distribution and servicing fees charged and received by Defendant PIMCO Investments LLC were designed to, and did, extract additional compensation for Defendant PIMCO Investments LLC's advisory services in violation of Defendant PIMCO Investments LLC's fiduciary duty under Section 36(b).

167. Although the distribution and servicing fees may have contributed to the growth in assets of the Fund, the resulting economies of scale resulting from increased assets under management in the Fund benefitted only the Defendants, and not Plaintiff or the Fund.

168. On information and belief, Defendant PIMCO Investments LLC failed to furnish information the Board needed to make an informed determination that any Rule 12b-1 distribution plan for which Defendant PIMCO Investments LLC charged distribution and servicing fees should be continued.

169. In failing to pass along economies of scale from the distribution and servicing fees, and in continuing to assess distribution and servicing fees pursuant to plans of distribution despite the fact that no benefits inured to Plaintiff, Defendant PIMCO Investments LLC has violated and continues to violate the ICA and has breached and continues to breach its fiduciary duty to Plaintiff in violation of Section 36(b), both as a result of a flawed negotiating process and/or with respect to the substantive amounts of the fees.

170. Plaintiff seeks, pursuant to Section 36(b)(3) of the ICA, the "actual damages resulting from the breach of fiduciary duty" by Defendant PIMCO Investments LLC, up to and including the "amount of compensation or payments received from" the Fund or, pursuant to Section 47(b) of the ICA, rescission of the contracts.

RICHARDSON, PATRICK, WESTBROOK
& BRICKMAN, LLC
174 East Bay Street, P.O. Box 879
Charleston, SC 29401
TELEPHONE: (843) 727-6520
FACSIMILE: (843) 727-3103

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, Washington 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

## VIII.   PRAYER FOR RELIEF

WHEREFORE, the Plaintiff demands judgment as follows:

a.      Declaring that the Defendants violated and continue to violate Section 36(b) of the ICA and Rule 12b-1 and that any investment advisory and/or supervisory and administrative and/or distribution agreements entered into between them and the Fund are void *ab initio*;

b.      Preliminarily and permanently enjoining the Defendants from further violations of the ICA;

c.      Awarding damages, including, without limitation, rescissory damages, against the Defendants in an amount including all investment advisory, supervisory and administrative, distribution and servicing fees paid to them by Plaintiff and the Fund for all periods not precluded by any applicable statutes of limitation through the trial of this case, together with interest, costs, disbursements, attorneys' fees, and such other items as may be allowed to the maximum extent permitted by law;

d.      Awarding prospective relief in the form of reduced investment advisory, supervisory and administrative, distribution and servicing fees in the future based not simply upon a percentage of assets formula but also based upon the reasonableness of the gross compensation received by Defendants in absolute dollar terms when considering the assets under management in the Fund; and

e.      Such other and further relief as may be proper and just.

### JURY DEMAND

171.    Plaintiff, on behalf of the PIMCO Total Return Fund, demands a trial by jury on all claims so triable.

**RICHARDSON, PATRICK, WESTBROOK
& BRICKMAN, LLC**
174 East Bay Street, P.O. Box 879
Charleston, SC 29401
TELEPHONE: (843) 727-6520
FACSIMILE: (843) 727-3103

**KELLER ROHRBACK L.L.P.**
1201 Third Avenue, Suite 3200
Seattle, Washington 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

DATED this 31st day of December, 2015.

KELLER ROHRBACK L.L.P.

By: s/ Michael D. Woerner
By: s/ Tana Lin
By: s/ Laura R. Gerber
By: s/ Ian Mensher

Michael D. Woerner, WSBA #15452
Tana Lin, WSBA #35271
Laura R. Gerber, WSBA #34981
Ian Mensher, WSBA #39593
1201 Third Avenue, Suite 3200
Seattle, WA 98101
Tel: (206) 623-1900
Fax: (206) 623-3384
Email: mwoerner@kellerrohrback.com
           tlin@kellerrohrback.com
           lgerber@kellerrohrback.com
           imensher@kellerrohrback.com

RICHARDSON, PATRICK,
WESTBROOK & BRICKMAN, LLC
James C. Bradley (Admitted *pro hac vice*)
jbradley@rpwb.com
Nina Fields Britt (Admitted *pro hac vice*)
nfields@rpwb.com
Matthew A. Nickles (Admitted *pro hac vice*)
mnickles@rpwb.com
Richardson, Patrick, Westbrook &
Brickman, LLC
1017 Chuck Dawley Blvd.
Post Office Box 1007
Mount Pleasant, SC 29465
Tel: (843) 727-6500
Fax: (843) 881-6183

RICHARDSON, PATRICK, WESTBROOK
& BRICKMAN, LLC
174 East Bay Street, P.O. Box 879
Charleston, SC 29401
TELEPHONE: (843) 727-6520
FACSIMILE: (843) 727-3103

Michael Brickman (Admitted *pro hac vice*)
mbrickman@rpwb.com
Richardson, Patrick, Westbrook &
Brickman, LLC
174 East Bay Street
P.O. Box 879
Charleston, SC 29401
Tel: (843) 727-6520
Fax: (843) 727-3103


***Attorneys for Plaintiff Robert Kenny***

RICHARDSON, PATRICK, WESTBROOK
& BRICKMAN, LLC
174 East Bay Street, P.O. Box 879
Charleston, SC 29401
TELEPHONE: (843) 727-6520
FACSIMILE: (843) 727-3103

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, Washington 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384